In re **CONTINENTAL INVESTMENT CORPORATION, Debtor.**

No. 76–1158–MA.

United States District Court, D. Massachusetts.

Jan. 12, 1982.

Fulbright & Jaworski, Houston, Tex., Cole & Deitz, New York City, Sp. Counsel, for Trustee.

Craig & Macauley, Boston, Mass., for Majority Stockholders.

Nutter, McClennen & Fish, Boston, Mass., for Committee of Bank Creditors.

Hale & Dorr, Boston, Mass., for Debentureholders' Protective Committee.

Weil, Gotshal & Manges, New York City, for O.C. Associates.

Zalkin, Rodin & Goodman, New York City, for Chemical Bank.

Ropes & Gray, Boston, Mass., for debtor.

### MEMORANDUM AND ORDER ON APPLICATIONS FOR FINAL ALLOWANCES

MAZZONE, District Judge.

◼ This matter is before the Court on the applications for final allowances for compensation for services rendered by counsel and reimbursement of expenses incurred by various parties participating in this reorganization proceeding. Although the proceedings have not yet finally concluded,[1] a

---

1. I expect to consider supplemental applications concerning a pending appeal, a litigated claim and miscellaneous administrative work.

plan of reorganization has been confirmed and substantially consummated and a total of $164,596,207.98 already has been disbursed by the Trustee. This, then, is an appropriate time to make such final allowances. *See Interstate Stores, Inc.*, Nos. 74–B–614 to –802 at 12 (S.D.N.Y. April 13, 1979). Attorneys' fees and allowances in bankruptcy proceedings generate much controversy. Too often, criticism of allowances and fees is accepted because of a lack of knowledge or appreciation of what has been accomplished. While it is impossible to relate all the significant events in this voluminous record, a brief background is essential to an understanding of the conclusions I have reached. The fee applications will then be examined against that backdrop and in light of the standards applicable to the allowance of compensation.

## I. *Background*

Between 1968 and 1974, Continental Investment Corporation (CIC) grew from a holding company with $21.3 million in cash, no debt and one subsidiary to become the parent of eight subsidiaries which owed over $90 million. This period was characterized by rapid growth, a heavy debt burden assumed to acquire subsidiaries, an expansion-oriented management and a resulting highly leveraged financial structure which was unable to withstand a weakening in the real estate and securities markets. Several subsidiaries were sold or terminated and CIC entered bankruptcy proceedings with major operating subsidiaries in the fields of life insurance, investment advisory services, and oil and gas exploration. In 1976, it sought protection under Chapter XI of the bankruptcy laws, anticipating that an out-of-court agreement among its stockholders, debentureholders and lenders could be implemented within the framework of a Chapter XI plan. Upon motion of the Securities and Exchange Commission (SEC), and after appeal to the United States Court of Appeals for the First Circuit, the matter was transferred to Chapter X. This Court has presided over the Chapter X proceedings since the summer of 1978. *See In re Continental Investment Corp.*, 586 F.2d 241 (1st Cir.1978).

Each of CIC's subsidiaries functioned in a highly regulated and sensitive environment. United Investors Life Insurance Company (UILIC) was subject to the constant scrutiny of the Missouri Insurance Commission, and operated under a letter agreement requiring advance approval by the Commissioner of inter-company advances. Waddell & Reed, Inc. (W & R), which functioned as investment advisor to the United Group of Mutual Funds (Funds), was a regulated investment company regularly monitored by the Securities and Exchange Commission and by the independent directors of the Funds who were free to take their lucrative business elsewhere. ConVest Energy Corporation (ConVest) raised money for gas and oil exploration and investment from recurrent public offerings of limited partnership interests.

All of the subsidiaries were dependent on maintenance of their public image and had the delicate task of avoiding the stigma of their parent's Chapter X proceedings. It would be hard to conceive a greater embarrassment for a financial services company than its own bankruptcy. Equally important and inseparable from public perception was the morale and conduct of the several thousand employees of CIC and its subsidiaries.

As mandated by statute, 11 U.S.C. § 556, I introduced into this fragile environment a Trustee, Paul Lazzaro, whom I appointed on August 7, 1978 (Trustee).[2] On August 14,

---

2. At the first meeting, attended by the principal parties and the SEC, I informed all that Mr. Lazzaro was my first choice as Trustee and allowed a brief period of time for any objections or comments. I stated my long friendship with Mr. Lazzaro and my high regard for his business acumen and his reputation. I was also aware that Mr. Lazzaro was already serv-

ing as the Receiver in an ongoing bankruptcy proceeding which eventually ripened into a Chapter X proceeding, Continental Mortgage Investors, No. 76–593–S (D.Mass.), at which time Mr. Lazzaro was named a Co-Trustee by Judge Skinner. Those proceedings involved some of the same parties, creditors, and attorneys. Thus, Mr. Lazzaro was at least familiar

1978 I authorized him to employ Daniel M. Glosband of Goldstein & Manello as his counsel under general retainer (Trustee's Counsel). I appointed Paul Lazzaro because I was familiar with his background of business training, experience and achievements. The objective, communicated to all, was to accomplish a reorganization as quickly and efficiently as possible. The appointment of a competent trustee would provide hope to all concerned, including management, creditors, and employees. While not minimizing the importance of the continuity of the management personnel of CIC and its subsidiaries, I believe the ultimate success of these proceedings was attributable to the Trustee's ability to nurture this multi-faceted enterprise, to maintain the confidence and loyalty of its employees, to refine its management structure and operations, to inspire its sales staff, to solidify its capital structure, to retain and improve its favorable contractual relationships and, generally, to see its profitability climb from $6,863,000 in 1978 to $11,356,000 in 1980. During the Trustee's tenure, insurance in force at UILIC grew from $3.5 billion to some $6 billion, while hydrocarbon reserves at ConVest increased substantially and assets managed by W & R increased from $1.9 billion to $2.4 billion.

While the Trustee acted as chief executive for this complex financial empire, he simultaneously and with the able assistance of counsel conducted an unusually rapid and successful Chapter X reorganization. The average life of Chapter X cases is seven and one half years. Here, in just over three years from conversion to Chapter X,[3] bank creditors have been paid in full principal of $25,851,000 and interest of $19,979,545, debentureholders have been paid in full principal of $38,670,000 and interest and conversion premiums of $25,052,794, while shareholders have received $35,765,698, or $3.00 per share and will receive additional sums when various reserves for litigation and expenses are finally liquidated. Some shareholders elected to defer receipt of their distribution to 1982 by electing to accept an interest in a promissory note from Liberty, to be paid in 1982. Therefore, an additional $4,036,861 will be paid to shareholders, for a total of $39,802,559.

The Majority Stockholders facilely belittle the role of all other parties to this case and claim full credit for the unusual success of the proceedings.[4] I see it differently. To Paul Lazzaro more than any one else is due the gratitude and commendation of this Court and the participants in this case. The success of these proceedings resulted from his diligence, his intelligence, his ability to maintain patience and composure under pressure, and his plain hard work. Remarkable skill and perseverance was required of the Trustee, the Trustee's Counsel and the other parties to keep the efforts of these same Majority Stockholders from destroying the reorganization. Their actions were often abrasive, dilatory, and costly. Even the Court of Appeals has had several occasions to note the character of the Majority Stockholders' behavior in these proceedings, stating in one such instance:

> We thus find all of [the Majority Stockholders'] arguments to be devoid of merit. We are led by this conclusion to consider the repeated assertion by each of the several appellees before us both that the [Majority Stockholders'] arguments are 'captious,' 'patently frivolous,' 'fatuous at

with the cast of characters. No objections to Mr. Lazzaro were received from any of the parties or the SEC at this informal stage, nor was any objection filed later, after the appointment, appropriate disclosures and passage of the statutory period for objections to disinterestedness.

3. Conversion order was entered by Bankruptcy Judge Glennon on June 9, 1978, but activities began when the case was permanently assigned to this Court later that summer.

4. The Majority Stockholders conveniently discuss only those decisions that favor their view of the fee requests. The Trustee, conversely, refers the Court to a broad and even handed discussion of applicable law filed earlier in the proceedings. Cf. Disciplinary Rule 7–106(B)(1). In addition, they bitterly decry increases in the billing rates of various applicants during the three years of the proceedings, while their own counsel, William Macauley, raised his rates nearly 40% during this period.

best and deliberately misleading at worst,' and 'so brazenly misleading as to evoke awe.' Appellees further assert that this litigation strategy serves a deliberate overall purpose—to delay a final plan of reorganization while the assets of the bankrupt continue to appreciate, seek an upward revaluation, and thus gain a larger share of the equity of the reorganized company. We give some credit to these assertions.

*In re Continental Investment Corp.,* 642 F.2d at 5 (1st Cir.1981). *See also In re Continental Investment Corp.,* 637 F.2d 1 (1st Cir.1980); *In re Continental Investment Corp.,* 637 F.2d 8 (1st Cir.1980).

At the time of the Trustee's appointment in 1978 and in the year or so thereafter, CIC's common stock traded between $.25 and $.50 per share; as a result of the reorganization, stockholders have already received $3.00 per share in cash, plus one share of ConVest, which is worth over $2 per share based on the latest reserve information and valuation analysis available to the Court. CIC's convertible debentures traded between $16 and $38 per $100 of face amount during 1978; under the reorganization, they have been paid approximately $170 per $100 of face amount. The straight debentures were paid at approximately $160 per $100 of face amount under the plan, compared to their trading range in 1978 of between $23 and $38.

Similarly illuminating is the contrast between the initial investment of the Wallaces, holders of a majority of CIC stock, of approximately $4 million, which had essentially been lost by the time of conversion to Chapter X, and the distribution to them under the plan of approximately $40 million in cash and ConVest stock. The aggregate promoter, private and public equity funding of CIC was approximately $21.6 million. Notwithstanding its negligible value in 1978, a total of nearly $64 million in cash

and ConVest stock has been distributed under the plan to holders of common stock.

Had the Trustee and his counsel not overcome efforts to sell ConVest and to deny it necessary financing, had they not resisted proposals for sale of the subsidiaries at distressed prices, and cash payment of debts made during 1978 and 1979 [5] and had they not skillfully handled this whole case, the stockholders might well have received nothing. Instead, they have received about $64 million—three times their investment.

In my view, CIC was successfully reorganized, in a business sense, by the Trustee and the management personnel under him long before the Majority Stockholders decided to search for a buyer. The Trustee had negotiated a modified reorganization plan which appeared to satisfy the Chapter X requirements that it be feasible and fair and equitable. The senior and junior creditors supported this plan, and it would have permitted an early and successful emergence from the proceedings, albeit subject to the continuing and predictable complaints of the Majority Stockholders. The determination by the Majority Stockholders to seek a buyer for the enterprise presumably reflected their conclusion that their self-interest was served by an immediate "cashing in" of the value that the Trustee and the professionals employed by him had created, rather than by realization of that value over time from their stock holdings. It is no surprise that a buyer emerged for such a desirable acquisition. The Trustee would have had similar success had he not been discouraged from such an approach to reorganization. The Majority Stockholders suggest that the price paid was "generous," as if the buyer had a purely philanthropic interest in acquiring CIC. The price was fair and was consistent with my findings of value, but far below, over $60 million below, the Majority Stockholders' suggestions of value at the time of valuation hearings. Some credit is due the Majority Stockholders for finding the buyer, but the major

---

**5.** The Court recalls discussions of an offer of approximately $50 million that some creditors endorsed.

share of the credit should go to those who rehabilitated the estate and made it a coveted acquisition.

A striking illustration of what has been accomplished by this reorganization can be shown by the following chart:

## STATEMENT OF TRUSTEE'S RECEIPTS AND DISBURSEMENTS

Funds Received by the Trustee:

| | | |
|---|---|---|
| Sales price of Continental Investment Corporation (CIC) stock | | $166,000,000.00 |
| Add: Total certified delay adjustment at closing | | 2,354,909.47 |
| Proceeds received from excess cash settlement | | 5,420,812.50 |
| | | $173,775,721.97 |
| Interest earned to date on undistributed funds | | $ 122,563.07 |
| Total funds received | | $173,898,285.04 |

Funds disbursed by the Trustee:

| | | |
|---|---|---|
| Purchase of ConVest Energy Corporation and ConVest Securities Distributors capital stock | | $ 14,000,000.00 |
| Payments to bank creditors | | 45,830,545.02 |
| Payments to indenture Trustees for | | |
| 9% Subordinated Debentures due 1985 (Banker's Trust) | $62,194,708.87 | |
| 9% Convertible Subordinated Debentures due 1990 (First National Bank of Boston) | 1,528,085.63 | |
| | | 63,722,794.50 |

Funds Segregated for distribution to shareholders:

| | | |
|---|---|---|
| First distribution | $30,517,037.03 | |
| Second distribution | 5,248,661.20 | |
| Third distribution 1/2/82 (Proceeds of Promissory Note) | 4,036,861.41 | |
| | | 39,802,559.64 |

Claims and expenses paid:

| | | |
|---|---|---|
| American Bond Fund | $ 176,339.62 | |
| Diversified Mortgage Investors, Inc. | 900,000.00 | |
| First Boston Corporation—expenses | 148,768.94 | |
| Bankers Trust Company—expenses | 15,200.26 | |
| | | 1,240,308.82 |
| Total funds disbursed | | $164,596,207.98 |
| Balance of Undisbursed funds | | |
| | | $ 9,302,077.06 |

## II. *Fee Applications*

Applications for compensation and reimbursement have been submitted by the Trustee's Counsel; Peat, Marwick, Mitchell & Co.; the Trustee's accountants; Fulbright & Jaworski, special counsel to the Trustee; Cole & Deitz, special counsel to the Trustee; The First National Bank of Boston, Indenture Trustee; The Minority Stockholders' Committee; Craig & Macauley, counsel to the Majority Stockholders; Robert G. Wiese, Robert S. Yoder, Allan R. Finlay, and Massachusetts Fiduciary Advisors, agents of the stockholders; Bankers Trust Company, Indenture Trustee; Price Waterhouse, the debtor's former accountants; Nutter, McClennen & Fish, counsel to the Committee of Bank Creditors; The

Committee of Bank Creditors; Hale & Dorr, counsel to the Debentureholders' Protective Committee; The Debentureholders' Protective Committee; Weil, Gotshal & Manges, Counsel to O.C. Associates; O.C. Associates, a debentureholder; Zalkin, Rodin & Goodman, counsel to Chemical Bank; Chemical Bank; and ConVest Energy Corporation. Also before the Court is the application of Ropes & Gray, counsel to the debtor during the period in which this proceeding was conducted under Chapter XI, which application was granted in part with the balance deferred for this Court's consideration by Bankruptcy Judge Glennon. On December 26, 1978, I referred all applications for compensation and reimbursement in the superseded Chapter XI proceedings to Bankruptcy Judge Glennon, all of which had taken place before him. Judge Glennon denied applications of the two indenture trustees based on a statutory and precedential preclusion of awards to indenture trustees in Chapter XI proceedings. Since that bar no longer exists and since the Chapter X proceedings are deemed to relate back, I have considered the requests of Bankers Trust Company and The First National Bank of Boston for services rendered during the Chapter XI period, and that consideration is reflected in the allowances to them.

Judge Glennon provided no indication to his basis for partial allowances of the applications of Ropes & Gray, Cole & Deitz, Hale & Dorr, and Price, Waterhouse & Co., nor for his suggestion that I take the "balance of such applications under advisement."

Nevertheless, I will treat these balances below. I have reviewed those applications and his order to determine what, if any, benefit has been provided to the estate. To the extent that I have been able to do so, I have treated the Chapter XI balances below.

Objections to the allowance of various applications have been made by the Trustee; Liberty National Insurance Holding Company, the purchaser of CIC (Liberty); Glen Corporation and Monte and Neil Wallace, the Majority Shareholders; and the Committee of Minority Shareholders. The SEC has taken no position with regard to any of the applications. Memoranda in support of fee applications have been filed, as have memoranda in support of objections. After hearing, opportunity was provided for pleadings responding to objections. I have now had the opportunity to review these submissions in detail. The parties have discussed the law concerning the standards that govern allowances in a reorganization proceeding and have called the court's attention to various activities and actions of themselves and/or others they feel either merit or do not deserve compensation from the estate. To all of this may be added the Court's intimate familiarity with these proceedings. For almost 3½ years, at many hearings, both extended and brief, I have had ample opportunity to observe the performance of the parties and their counsel herein, to read the pleadings they have filed and to see the results of their efforts.[6]

6. The Majority Stockholders have requested an evidentiary hearing on these fee applications, claiming a right to cross-examine the Trustee. They cite *Matter of First Colonial Corp. of America*, 544 F.2d 1291 (5th Cir.), *cert. denied*, 431 U.S. 904, 97 S.Ct. 1696, 52 L.Ed.2d 388 (1977), and *Cle-Ware Industries, Inc. v. Sokolsky*, 493 F.2d 863 (6th Cir.), *cert. denied*, 419 U.S. 829, 95 S.Ct. 50, 42 L.Ed. 253 (1974). That request was denied. In both of the cases cited by the Majority Stockholders, hearings were appropriate, upon remand, because of the incomplete and insufficient documentation to support the petitions for compensation, and a failure to justify awards with findings and reasons. Further, there was evidenced concern in *Cle-Ware*, described as a "masterful" accom-

plishment justifying very substantial fees when general creditors received only five cents on the dollar with stock options or a possibility of fifteen to twenty cents on the dollar for those who opted for deferred payment. That is a far cry from the accomplishment here.

These petitions are supported with details of time spent, hourly rates, type of work done in both narrative and short form. Given the prior performance of the Majority Stockholders, a hearing would not enhance this already voluminous record. For example, counsel for the Majority Stockholders indicated the type of question he intended to ask the Trustee at the hearing. "Why do you think you are entitled to …?" or "What did you do that makes you think you should receive …?" While eviden-

As noted earlier, a successful outcome has been produced in a proceeding that has been marred at times by factious squabbles and ardent, if not always well-considered, advocacy. Reorganization proceedings are never conducted with the certainty of success, and it is gratifying to know that here the creditors have been paid in full and the shareholders have received a generous return on their investment.

III. *Discussion of Allowances to Trustee and Trustee's Counsel Standards for Compensation of Trustee and Trustee's Counsel*

■ Section 241 of the Bankruptcy Act and Bankruptcy Rule 10–215(c)(1)(A) permit the Court to allow reasonable compensation for necessary services rendered by a Chapter X Trustee and the Trustee's counsel. Among the factors to which courts look in determining compensation for services rendered by a Trustee and his counsel are the following:

1. The time that was required in dealing with the case;
2. The novelty and complexity of the issues presented;
3. The opposition encountered;
4. The skill demanded by the questions presented;
5. The customary charges for similar services;
6. The professional standing, ability and reputation of counsel;
7. The amount in controversy;
8. The results achieved.

*See In re Westec Corp.,* 313 F.Supp. 1296, 1303 (S.D.Tex.1970).

The Majority Stockholders understandably emphasize the spirit of economy of administration as a factor in making allowances in reorganization cases.[7] This ele-

ment was stressed in such cases as *Massachusetts Mutual Life Insurance Company v. J.H. Brock,* 405 F.2d 429 (5th Cir.1968), *cert. denied,* 395 U.S. 906, 89 S.Ct. 1748, 23 L.Ed.2d 220 (1969), as a proper factor to be considered in proceedings under the Bankruptcy Act, which, although now repealed, governs here. The Court is mindful, however, that in drafting the statute that has now superseded the Bankruptcy Act, the Congress explicitly expressed its intent to overrule cases such as *Massachusetts Mutual Life,* finding notions of economy of the estate in setting fees to be "outdated." 124 Cong.Rec. S17,408 (daily ed. Oct. 6, 1978) (remarks of Sen. DeConcini). *See also Butenas,* Establishing Attorney's Fees under the New Bankruptcy Code, Business Lawyer, Vol. 37, Nov., 1981.

The Court takes its guidance from the United States Court of Appeals for the First Circuit, which adopted a two-step approach to the awarding of attorneys' fees in a civil rights action under 42 U.S.C. § 1983. *Furtado v. Bishop,* 635 F.2d 915 (1st Cir. 1980). The methodology described there by the Court consisted of first examining the time records provided by counsel to ascertain the number of hours reasonably expended on the litigation and then determining a reasonable hourly rate to be applied to time spent. The second step was to adjust the resulting time charges as necessary to recognize exceptional merit (or an exceptional lack thereof). To term such an adjustment a "bonus" or "kicker," as the Majority Stockholders prefer to call it (at least where the adjustment is upward), is perhaps not inaccurate; one might also consider it simply a recognition that particularly fine and efficient (or particularly poor) services deserve to be compensated at an overall higher (or lower) rate than merely adequate or customary ones. Disagreement exists among the circuits in their ap-

---

tiary hearings are encouraged, they are expensive, time-consuming and, in this case, would be unproductive. No factual dispute as to hours, or rates is presented as the basis. The result would be a subjective and argumentative colloquy which would not be helpful to the Court.

7. The Majority Stockholders filed objections to all the fee applications, except, somewhat inconsistently, the fee applications of the minority stockholders. Obviously, any reduction in allowances would accrue to the benefit of the stockholders.

proaches to compensation in a reorganization, but I believe the better approach to be that reflected in the First Circuit's opinion discussed above.

■ In making its determination as to final fee allowances, the Court will not look to the awards of interim compensation already made herein to the Trustee and his counsel (except to note that the amount of any interim allowance must be deducted from the final allowance before payment is made). As the SEC pointed out in its recommendations at the time of the first and second interim allowance hearings, interim allowances are not intended to be a determination of the value of the services rendered, but rather are "merely sustaining" awards intended to be well below the amount of any final allowance.[8]

Liberty has contracted to pay administrative expenses attributable to the period July 1, 1981 through October 26, 1981. Before dealing with the various applications, I note Liberty's objection that it did not believe it would be obligated for allowances to the Trustee and Trustee's Counsel at a rate greater than that sought by them in interim allowance requests. The Stock Purchase Agreement executed by Liberty and the Trustee as of June 5, 1981 requires Liberty to pay a "Delay Adjustment" including the expenses of administration of the Chapter X attributable to the period from July 1, 1981 through the closing on October 26, 1981 (Liberty period). The agreement provides no insight into the parties' expectations of the rates at which fees would be allowed, nor does it limit Liberty's exposure to maximum rates or amounts. Nonetheless, I accept Liberty's recently expressed view on this issue, and it will be reflected in my treatment of those applications. On the other hand, I do not accept Liberty's suggestion that they are not obligated for certain categories of services, since they must have known that there would be administrative expenses after July 1, 1981 which would not relate exclusively to the acquisition. I have noted below the portion of allowances to be reimbursed by Liberty. In so doing, I have considered Liberty's December 28, 1981 letter requesting that I limit their obligation to my findings of compensable services after July 1, 1981. I turn now to each application.

### Application of Paul Lazzaro, Trustee—Docket # 1055[9]

■ Mr. Lazzaro has applied for a final allowance of $743,325.00 as compensation for services rendered and $4,111.96 in reimbursement of expenses incurred. If I were to accept the Majority Stockholders suggestion that the value of the CIC estate evidenced by the adjusted Liberty offer is $197,000,000, the Trustee's request is equal to .37% of that value. Mr. Lazzaro has served as the reorganization trustee for CIC since his appointment by the Court in August 1978. The Court has regularly had the opportunity over the past three years to observe Mr. Lazzaro's performance and to see the results of the decisions and actions taken by the Trustee through court appearances, pleadings and reports presented to the Court.

Mr. Lazzaro's activities on behalf of CIC have been described in detail in his applications for interim allowance and in his reports to the Court and are summarized in a memorandum presented in support of his fee application.[10] I have already set out the

---

8. The majority shareholders cite a purported attempt by the Trustee to increase the hourly rates requested for his services above $69.12 per hour, allegedly sought in the Trustee's first application for interim allowance. The Court finds Mr. Lazzaro's first application to have been simply a request for the lump sum of $15,000 without regard to the number of hours spent; the Trustee made clear in his application that he was not attempting to establish therein a final rate of compensation and that he would seek a final allowance in whatever

amount he deemed appropriate, subject, of course, to this Court's review.

9. I have noted the docket number of each application so that they may be easily located in this expansive record.

10. Each of the applicants has, in greater or lesser detail, provided in its application or supporting memorandum information on the particular services it has rendered and for which it seeks to be compensated. To the extent that I found such statements to be persuasive and

backdrop above against which the Trustee endeavored to rehabilitate the bankrupt. In addition to operating CIC as a business, the Trustee was charged with the task of developing a reorganization plan for CIC, which meant, in the first instance, determining whether CIC should be reorganized or whether it should simply be liquidated. Deciding that CIC could be a viable and valuable business if certain changes could be implemented, the Trustee rejected immediate liquidation as an option and began the task of reshaping CIC. This required that the Trustee not only concern himself with operations at CIC's Boston headquarters, but that he address the functioning of CIC's major subsidiaries in Houston and Kansas City. The Trustee regularly dealt with operating management of CIC, UILIC, W & R and ConVest. The Trustee's efforts in this regard have been quite successful, and data cited by him show increases in statistics of major financial importance for both CIC and its subsidiaries. As discussed above, while the Majority Stockholders did find the purchaser to whom CIC was ultimately sold, Liberty appeared at what was almost the eleventh hour of these proceedings; the Court believes that Mr. Lazzaro, who had responsibility for CIC's progress during the period of reorganization, must be given a large share of the credit for making CIC an attractive acquisition.

The Trustee had other duties in addition to his responsibility for managing the company. He and his counsel conducted an investigation into CIC's business and into potential causes of action of the estate, and they provided the Court with excellent reports pursuant to Sections 167(1) and 167(3) of the Bankruptcy Act. Contested claims against the estate were not numerous, but the Trustee was able to achieve substantial reductions in certain claims, at a savings of millions of dollars to the estate. The Trustee's first plan of reorganization for CIC

was filed in February, 1980. A major milestone in the case occurred thereafter, when the Trustee and his counsel were able to negotiate a compromise of the estate's controversies with its Senior Bank Creditors achieving a reduction in Senior claims of as much as $13.7 million; other benefits, including the saving of litigation expenses and the preservation of ConVest as a subsidiary, were also realized by the estate. The Majority Stockholders and the Minority Stockholders opposed this compromise, and fail in their fee objections to note that the Liberty acquisition would have been impossible had litigation with the banks continued. Had the banks won such litigation, the stockholders would have received cash of $22,000,000, instead of the approximately $40,000,000 that they have received.

The Trustee's stewardship of CIC and its subsidiaries through the maze of the Chapter X, causing the business to flourish while adeptly managing the reorganization cannot be adequately compensated. Considering each of the *Westec* factors reinforces this conclusion:

1. Time required: The Trustee has recorded 2,703 hours for his over three years of service. I will use time spent as a base, although in this case I do not believe those hours accurately reflect the intensity and pressure of the time actually recorded as spent, nor the unrecorded time which I believe can be reasonably estimated. This was not a case where the problems could be left at the office. In addition, he had borne the fulltime responsibility of being chief executive of this highly regulated, very complicated business.[11]

2. Novelty and complexity of issues: The Trustee, among other things, successfully addressed business issues relating to restructuring the marketing arm of the company, decisions to develop and market two new investment products and to refrain

---

accurate, I shall borrow from their descriptions. I accept as accurate the description of beneficial activities of the Trustee and Trustee's Counsel contained in pages 16 through 34 of their memorandum, and incorporate it herein by reference.

**11.** In the related Chapter X, Continental Mortgage Investors, No. 76–593–S, Judge Skinner appointed two co-trustees and set compensation at $125 per hour, each, or a total of $250 per hour.

from developing a third, a decision to refinance ConVest and not to sell it, a realignment of the corporate operating structure and continual upgrading of insurance products. In the Chapter X, the Trustee caused litigation and/or compromise of the American General Bond Fund claim, a claim against Drexel, Burnham, Lambert, the claim of Diversified Mortgage Investors and the bank claims, benefiting the estate to the extent of over $15,000,000.

3. Opposition: As noted, much of the Trustee's activity was opposed, both by a direct adversary in particular situations and by the Majority Stockholders. All were sophisticated and knowledgeable, and all employed competent and aggressive counsel. In each case, the Trustee achieved an excellent result, and despite tense, often fractious relationships over the particular disputes, I observed that commendable civility and professionalism was maintained.

4. Skill: The skill demanded of and applied by the Trustee was the highest. The challenge he faced required that he protect the assets, restore communications and develop a plan. He started with a disorganized board of directors and a paralyzed management team. Having to rely on the management team in place, he was able to quickly evaluate their individual capabilities and utilize them fully. He rapidly developed credibility inside and outside CIC. In all his actions, he was courageous and prudent, operating always under the scrutiny of the parties and the SEC. This was outstanding management skill.

5. Customary charges: CIC's operating officers received over $440,000 in direct compensation for 1980, and received retroactive bonuses of $111,200. Its president received a total of $206,250. The Trustee, whose duty it was to monitor the operations and the officers and to manage the Chapter X, should receive more than his staff. I also note that the chief executive in the *Interstate Stores* Chapter X case received compensation of over $400,000 in 1978, as did the chief executive in the *Daylin* Chapter XI.

6. Amount involved: As noted, the Majority Stockholders suggest an adjusted value of $197,000,000. The component amounts of revenues and expenses, are detailed in Form 10K filings, while the amount of debt satisfied was approximately $110,000,000 and some $40,000,000 has already been paid to stockholders.

7. Results: The introduction to the discussion capsulizes the results, which were excellent.

The Court is well pleased with the way in which Mr. Lazzaro has performed his duties as Reorganization Trustee of CIC. To borrow roughly an expression from a current television commercial, "[The Trustee] did it the old fashioned way. [He] earned it." I believe a reasonable compensation for Mr. Lazzaro to be $220 per hour. In salary terms, it amounts to slightly more than $180,000 per year. That figure is comparable to chief executives in other reorganizations and is less than the hourly rate charged by some counsel in this case. I have considered the costs of delay in receiving the award. In addition to time spent, I have factored in an amount which would reflect the magnitude of his accomplishments in the relatively short period of time. Other bankruptcy proceedings have dragged on for years with the attendant drain on the estate. That did not happen here. The objective was reached and should be reflected in his compensation. The argument will be made that the Liberty acquisition was the major breakthrough, but, I repeat, Liberty did not acquire a derelict; it acquired a vigorous, prospering entity, a far cry from the bankrupt estate delivered to the Trustee in August, 1978. I find reasonable compensation for Mr. Lazzaro's services from August, 1978 through October 31, 1981 to be $594,660.00. From this must be deducted compensation already received herein by the Trustee, in the amount of $217,874.25, leaving a balance of $376,785.75. Mr. Lazzaro is allowed reimbursement for expenses incurred in the amount of $4,111.96. Of this, I find that Liberty should pay $26,797.50 of the fee, all of which represents compensable services at the interim rate during the Liberty period.

Because no interim fees have been paid since August, 1981 and the Trustee has spent a substantial amount of time on the case since then, I specifically authorize payments to him of up to $200,000 before the expiration of the time for filing an appeal, if any, of this order. Further, I condition the payment of the balance of his fees upon my entry of a further order prior to or contemporaneous with the entry of a final decree herein that will reflect my conclusion that the proceedings have terminated, or will terminate in satisfactory fashion, consistent with the Trustee's Third Modified Plan of Reorganization of Continental Investment Corporation (Sale of Company) and the Order Confirming Plan of Reorganization.

### Application of Goldstein & Manello—Docket # 1052

Goldstein & Manello has served as counsel to the Reorganization Trustee from August 1978 through October 31, 1981. It has applied for final compensation for services rendered in the amount of $2,040,060 and for reimbursement of expenses in the amount of $20,117.46. Much of what I have said in discussing the Trustee's application applies as well to the application of Goldstein & Manello.

Goldstein & Manello has acted as general counsel to the Trustee. As such, its responsibilities have not been limited to bankruptcy representation, but have included all types of legal services demanded of counsel to a large corporation. It has represented the estate in areas including securities regulation, taxation and corporate matters, in addition to bankruptcy, and has served the estate competently and carefully. The estate has benefited from being able to look to a single law firm for its general legal representation.

Goldstein & Manello has appeared before this Court for over three years on behalf of the Trustee. The Court has been afforded the opportunity to observe Goldstein & Manello's advocacy on behalf of the Trustee, has had the benefit of its argument, both oral and written, on pertinent legal questions, and has seen its handling of issues arising in the course of this proceeding and the results obtained.

The Court believes that Goldstein & Manello must share credit with the Trustee for the considerable saving to the estate resulting from the compromise with the Senior Creditors and from the settlement of litigation such as that involving the American General Bond Fund and Diversified Mortgage Investors. The Court notes the contribution made by Goldstein & Manello to the Trustee's investigation and to the effort of resolving claims both by and against the estate. Goldstein & Manello was successful in sparing the estate any detriment from the entry of an injunction in respect of securities-related activities of CIC's Majority Shareholders. Goldstein & Manello was also called upon three times to defend orders of this Court on appeal, and it and counsel arguing with it prevailed in each instance.

The appearance of the purchase offer from Liberty presented a host of issues for the Trustee's counsel. Goldstein & Manello worked on the preparation of a stock purchase agreement and the drafting of a plan based thereon and a disclosure statement concerning the plan, and Goldstein & Manello represented the Trustee through the process of plan approval, acceptance and confirmation. The closing of the sale was in itself a major effort requiring the addressing of a myriad of legal issues, particularly with respect to corporate and securities law, and the preparation of a multitude of documents.

The Trustee's Counsel's compensation request is for a mixed rate, exclusive of paralegal time, of $110 per hour. Mr. Glosband, chief counsel, has been the attorney most responsible in this case, and his time has been charged at rates ranging from $95 to $135. This is far below the rates charged by senior counsel from other firms, which range from $175 to $250 per hour. Even less experienced counsel have billed their time at $110–$125 per hour. This rate, then is not an unfair rate given the time spent,

amounts involved, opposition encountered, skill displayed, standing and reputation of counsel [12] and results achieved.

The Court finds reasonable compensation to Goldstein & Manello for the services described above and all other services rendered to be $105 per hour. Given the number of hours as 18,765.6, the total is $1,970,-388.00. From this is to be deducted compensation already granted in the amount of $885,836.95, leaving a balance of $1,114,-555.05. Goldstein & Manello shall also be allowed reimbursement of expenses in the amount of $20,117.46. Of this, I find that Liberty should pay $259,601.00 of the fee and none of the disbursements, that amount representing compensable services at the interim rates during the Liberty period. Because of the substantial investment of time since the last interim award in August of 1981, I will authorize immediate payment of up to $300,000 to Goldstein & Manello even if this order is appealed.

### Application of Peat, Marwick, Mitchell & Co.—Docket # 1053

Peat, Marwick, Mitchell & Co. served as the Trustee's accountant. It seeks compensation for tax services in connection with its review of CIC's federal tax return for 1980 and for various accounting services provided in connection with the consummation of the stock purchase agreement between the Trustee and Liberty and in connection with the making of distributions pursuant to the confirmed plan. Reasonable compensation for the services rendered by Peat, Marwick, Mitchell & Co. is $44,160.00, and it shall be allowed $1,184.00 for reimbursement of its expenses. Liberty will reimburse this full amount as administrative expenses attributable to the period.

### Application of Fulbright & Jaworski—Docket # 1054

Fulbright & Jaworski, which represents ConVest generally, was retained as special counsel to the Trustee to assist in the preparation of the disclosure statement concerning the plan that was ultimately confirmed. In addition to its work on the disclosure statement, Fulbright & Jaworski rendered services in connection with the distribution agreement between ConVest and Waddell & Reed, Inc., another CIC subsidiary, and the required Hart-Scott-Rodino filing. Fulbright & Jaworski should be compensated for these services in the amount of $7,280.00 and reimbursed for expenses incurred in the amount of $343.28. Liberty should pay $1,050 of this amount.

### Application of Cole & Deitz Docket Nos. 1038, 1046

Cole & Deitz has served as special counsel to the Trustee and, during the Chapter XI period, to the debtor in connection with certain litigation in the United States District Court for the Southern District of New York. For such representation it seeks a final allowance for the Chapter X period and the balance of its request for allowance for the Chapter XI period, which balance was referred to this Court's consideration by Bankruptcy Judge Glennon. During (and even before) the Chapter XI, Cole & Deitz represented CIC in defending litigation brought by American General Bond Fund, Inc., and by five different plaintiffs claiming to represent classes against it and its subsidiary Diversified Advisers, Inc. It also dealt with the SEC in attempting to compromise the litigation over conversation of the case to Chapter X. Reasonable compensation to Cole & Deitz for said services is $28,006.00 and it is entitled to reimbursement of its expenses in the amount of $11.65.

---

12. Despite his relative youthfulness, Mr. Glosband has an outstanding record in handling major reorganization cases. I have had a firsthand opportunity to observe his talent and industriousness in another complex bankruptcy proceeding involving a real estate arrangement. He has served as chairman of the Bankruptcy Committee of the Boston Bar Association, now serves as chairman of the Bankruptcy Committee of the Massachusetts Bar Association, and has lectured frequently on bankruptcy reorganization. His ability to coordinate the efforts of his associates, and to present clearly and succinctly the Trustee's position in the varied areas of law in this case has been outstanding.

## IV. Discussion of Allowances to Parties Other than the Trustee and his Counsel

### Standards for Compensation of Other Parties

■ Allowances to persons other than the Reorganization Trustee and his counsel are governed by Sections 242 and 243 of the Bankruptcy Act and Bankruptcy Rule 10–215(c)(1)(B). The Bankruptcy Rule provides that reasonable compensation may be allowed to such persons for services that (a) are beneficial in the administration of the estate or (b) contribute to a plan that is approved or confirmed or to plan approval or confirmation or are rendered in opposition to a plan refused confirmation. In each instance, the services for which compensation is sought must have provided a benefit to the estate. *In re Yale Express System, Inc.,* 366 F.Supp. 1376, 1381 (S.D.N.Y.1973).

No matter how valuable or how competently provided, services that primarily benefit private parties to the proceeding rather than the estate as a whole are to be compensated by the clients benefiting therefrom and not by the estate. The Court's decision thus is not a reflection on the competence of counsel or on their performance of the tasks demanded by their representation of their clients; the Court is constrained to look at the results of the activities for which compensation is sought and to measure them against the yardstick of "benefit to the estate." This is a difficult and, sometimes, distasteful task, often incapable of a rational, tangible evaluation.

There are some general observations that must be made before the individual applications are considered. The first is the multiplicity of representation that has occurred in this proceeding. Participating on behalf of debentureholders are counsel for two indenture trustees, a committee of debentureholders, and an individual owner of debentures. The Senior Bank Creditors have formed a committee to represent their interests, but one bank has also retained its own counsel who participated herein. Two representatives of stockholders have also appeared, one on behalf of the Majority Shareholders and one representing a committee of minority shareholders. Institutional parties are seeking compensation not only for the fees and expenses of their counsel, but also for services and/or expenses of committee members or corporate employees who devoted time to this matter. While each party herein is certainly entitled to its own representation, the Court cannot award compensation in full to all participants *from the estate* in view of the substantial duplication of effort that accompanied this multiple representation. Unnecessary duplication could have been avoided from the outset by setting up an organizational structure among the attorneys representing the interests of the particular class.

A second observation concerns the valuation hearings. This Court held 21 days of hearings on the reorganization value of CIC, as well as the approval of a reorganization plan. At least 18 different expert witnesses provided opinions as to this reorganization value or components thereof. Those opinions ranged from $89 million to over $228 million. The Court noted at the time its reluctance to believe that the value of CIC could reasonably be said to cover a span of almost $140 million. It was inconceivable to me that the better financial minds of the country could have so disparate views on value of the components of CIC. The spread of values was so wide as to have been of little use to the Court in making its decision on valuation. The efforts of the parties, particularly those espousing the extremes, were clearly directed toward their own self-interests but were of limited benefit to the Court and to the estate.

I am further persuaded to some extent by the memoranda filed by Bankers' Trust Company and The First National Bank of Boston that compensation to indenture trustees is governed by § 242, which does not limit compensation to the "benefit" standard of § 243.

Finally, my allowances are based on time expended and contribution to the estate. Hourly charges range for senior partners up to $250 per hour. The average rate ranges

from $76 to $120 per hour. I have further adjusted hourly rates based on the type of service rendered, my experience and knowledge of prevailing rates in other cases, and the fee practices in this community.

### Application of Nutter, McClennen & Fish—Docket # 1045

The firm of Nutter, McClennen & Fish represented the Committee of Bank Creditors and The First National Bank of Boston as agent for the Senior Creditor Banks. The firm seeks compensation of $346,177.50 for all activities involved in its representation of its clients. Some of these activities, however, clearly were in the particular interests of the Senior Creditors and not of the estate. Efforts involving the necessity for the banks to file proofs of claim, the banks' position in respect of the ConVest financing and the investigation of the banks' entitlement to post-petition interest or a step-up ought not to be funded by the estate. After the initial skirmish, however, the banks' counsel did participate in the achievement of the compromise of the banks' claims, which contributed to both of the plans that were approved by the Court. That compromise was a substantial contribution. Further, I am mindful that when it was apparent that the ConVest return was not sufficient to fund the plan, the banks negotiated a modification to fit the available cash flow. At the same time, no benefit to the estate resulted from the opposition to the ConVest financing, the Drexel, Burnham litigation and the Weil, Gotshal & Manges disqualification litigation. The participation of Merrill Lynch, the bank's expert, in the valuation hearings was of some benefit as a sounder and more rational opinion than the extreme views of the other experts. Reasonable compensation for those services of Nutter, McClennen & Fish that meet the standards of Bankruptcy Rule 10–215 is $250,000.00 and the firm should be reimbursed for expenses in connection therewith in the amount of $36,121.27. Of that amount Liberty is responsible for $7,500 for services rendered during the Liberty period.

### Application of Committee of Bank Creditors—Docket # 1044

The expenses for which the Committee of Bank Creditors seeks reimbursement primarily relate to the valuation of CIC presented on the Committee's behalf by Merrill Lynch White Weld Capital Markets Group. That expense is $105,789.63. The Court's opinion as to valuation testimony has been presented above. I will allow reimbursement of $75,000.00 on account of this service and travel expenses of $1,659.24 for a total of $76,659.24.

### Application of Zalkin, Rodin & Goodman—Docket # 1076

The firm of Zalkin, Rodin & Goodman appeared on behalf of Chemical Bank, a creditor of CIC and one of the members of the Committee of Bank Creditors. The Bank Committee was ably represented by the firm of Nutter, McClennen & Fish and the Court finds duplication of effort in the separate representation of Chemical Bank. While not derogating from the competence of Mr. Goodman's firm, the quality of their work having been excellent, or the right of Chemical Bank to be represented by counsel of its choice, the Court cannot impose on the estate the full expense of individual representation of this Creditor's interests. Compensation is sought in the amount of $292,570.00.

The Court does find that the compromise of the claims of the banks and various other services of this firm have contributed to the approved reorganization plans. Without the compromise, in which some $13,700,000 was involved, the future of the Liberty acquisition would have been unpredictable, at best. Accordingly, I will make an allowance in respect of Zalkin, Rodin & Goodman's contribution in respect thereto, taking into consideration the duplication of Nutter, McClennen & Fish's efforts in this regard. Reasonable compensation for the services of Zalkin, Rodin & Goodman that enabled it to provide this benefit to the estate is $200,000, and the firm shall have reimbursement of its expenses in the amount of $34,460.78.

*Application of Chemical Bank—Docket # 1077*

Chemical Bank seeks reimbursement of expenses in the amount of $5,504.60, incurred in connection with its participation herein as a member of the Committee of Bank Creditors. The Court is unable to discern the precise benefit to the estate from the expenses for which reimbursement is sought and notes again the duplication of effort in the participation of counsel to the Bank Committee, counsel to Chemical Bank and employees of the Bank itself. The application of Chemical Bank for reimbursement of expenses is approved in the amount of $3,000.

*Application of The First National Bank of Boston Docket # 1068*

The First National Bank of Boston (FNBB) was the indenture trustee for holders of CIC's 9% Convertible Subordinated Debentures due 1990. FNBB seeks reimbursement of $53,763.75 for legal fees of its counsel and former counsel during the periods in which this case was conducted under Chapter XI and under Chapter X. The majority of the services for which FNBB seeks reimbursement were performed for the benefit of the debentureholders. However, FNBB has no source of payment other than the estate, claims that its fiduciary duty compelled its performance of services, and, as acknowledged above, persuasively argues that it should not be held to the "benefit" standard. The Court must once again note the multiplicity of representation of debentureholders herein and deny full compensation to FNBB for services that duplicated the efforts of other parties to the proceeding. Nonetheless, I consider a reasonable allowance for the services of FNBB that were of benefit to the estate to be $45,000, and FNBB is allowed reimbursement of expenses in the amount of $4,421.75. Said sums shall be the full amount to be allowed in respect of both FNBB's application for final allowance and its proof of claim for administrative expenses. Liberty shall reimburse $5,000.00 as attributable to services rendered during the Liberty period.

*Application of Bankers Trust Company—Docket # 1062*

Bankers Trust Company was the indenture trustee for holders of CIC's 9% Subordinated Debentures due 1985. It has requested an allowance for compensation for the services of its in-house counsel and staff members of two of its divisions, as well as its outside counsel in the amount of $224,465.29. Like FNBB, Bankers Trust seeks compensation as an indenture trustee pursuant to § 242 for services during both the Chapter X and Chapter XI periods.

Most of the services for which Bankers Trust seeks compensation were of benefit primarily to debentureholders and not to the entire estate. Communicating information to debentureholders, arguing on behalf of its application for compensation for the Chapter XI period and analyzing the entitlement of debentureholders to interest on their claims are among the activities for which Bankers Trust seeks compensation which were presumably required by Bankers Trust's duties to the debentureholders. Bankers Trust also requests reimbursement for its opposition to the transfer of these proceedings to Chapter X, a position the United States Court of Appeals for the First Circuit found not to be in the estate's interest. *In re Continental Investment Corporation,* 586 F.2d 241 (1st Cir.1978). The services of Bankers Trust duplicated to a considerable extent the services rendered by other debentureholder representatives. There was also duplication of effort between in-house counsel at Bankers Trust and its outside counsel, Goodwin, Procter & Hoar. Again, the Court will note that Bankers Trust certainly is entitled to representation of its choice and to employ its staff as it sees fit. Nevertheless, the Court cannot require the estate to bear the expense of multiple representatives of particular interests and I am not necessarily persuaded that some of its in-house work should not be treated as overhead.

Reasonable compensation for the services of Bankers Trust and its counsel is $60,000

and Bankers Trust shall be allowed reimbursement of expenses in the amount of $90,000. Said allowance is made in respect of both Bankers Trust application for compensation and reimbursement and its proof of claim for administrative expenses. Liberty shall reimburse $7,500 of this amount for services rendered during the Liberty period.

### Application of Hale & Dorr—Docket Nos. 1059, 1075

The Debentureholders' Protective Committee, one of four representatives of debentureholders to appear herein, was represented by the firm of Hale & Dorr.

The positive contributions made by the Debentureholders' Protective Committee to these proceedings are limited. Early in the proceedings, the committee urged the Court to make an immediate determination of CIC's solvency, a step which, if anything, delayed rather than expedited progress toward a reorganization plan. While no doubt appreciated by its clients, Hale & Dorr's efforts to assert the debentureholders' claim to interest on overdue interest was of no benefit to the estate. Committee members' post-petition purchases and sales of debentures, which Hale & Dorr mistakenly encouraged, led to the Trustee's prosecution and compromise of a claim of the estate against a committee member. The estate can hardly be charged with payment of the expenses of undertaking and defending actions that resulted in the payment of damages to the estate. Many other actions were undertaken by Hale & Dorr on behalf of its clients and provided no benefit to the estate, including objecting to the compromise with the bank creditors, and unsuccessfully negotiating with prospective purchasers. The valuation of the debtor presented on behalf of the committee was so low as to be of little use to the Court and of little benefit to the estate.

The duplication of effort among counsel to various representatives of debentureholders, already noted above, is further reason for failing to allow Hale & Dorr's application in full.

Hale & Dorr seeks compensation in the amount of $205,581.00 and also seeks a balance for Chapter XI services of $24,500, having received $74,000 in Chapter XI fees. Its Chapter XI services related primarily to its involvement in the attempt to compromise the Chapter X conversion litigation and to activities related to the appeals to the District and Circuit Courts from conversion-related orders. This effort was of marginal benefit to the estate and I have considered it in the final allowance.

The Court believes that the services of Hale & Dorr that were of benefit to the estate merit compensation in the amount of $95,000 and Hale & Dorr should be allowed reimbursement for expenses incurred in the amount of $9,548.55. Liberty shall reimburse $3,500 of this amount for services rendered during the Liberty period.

### Application of Debentureholders' Protective Committee Docket # 1058

This application seeks an allowance of $26,899.25. As has been noted, the Court found the valuation presented by witnesses called by the Debentureholders' Protective Committee to have been of small benefit, and limited reimbursement shall be allowed for expenses in respect thereof. The Committee fails to inform the Court as to the benefit to the estate provided by the other activities for which it seeks reimbursement. The applications of the Debentureholders' Protective Committee for reimbursement of expenses and compensation of consultants is allowed in the amount of $15,000.

### Application of Weil, Gotshal & Manges—Docket # 1066

As attorney for O.C. Associates, a holder of debentures, Weil, Gotshal & Manges was one of several firms providing overlapping representation of debentureholders herein. In submitting its application for compensation, Weil, Gotshal & Manges noted the standards set forth in Bankruptcy Rule 10–

215 and has excluded from its request for compensation a very large portion of the services it rendered in these proceedings.[13] It seeks an allowance of $207,500.00. Nevertheless, the Court is obligated to assess the benefit to the estate of those activities for which Weil, Gotshal & Manges does seek compensation, and the Court finds that not all were beneficial. In particular, Weil, Gotshal & Manges' concern for the attempted subordination of O.C. Associates provided a benefit to its client, but not to the estate. The largest part of the included time was spent on the preparation and presentation of testimony as to valuation; this attempt to establish an implausibly low value through the use of an inappropriate methodology was clearly for its client's own interest and did not benefit the estate. The Court also notes that Weil, Gotshal & Manges does not seem to have attempted to be particularly efficient in the use of its attorneys' time, sometimes having as many as four attorneys in the courtroom on a single day.

The Court finds reasonable compensation for the services of Weil, Gotshal & Manges that were of benefit to the estate to be $150,000, and Weil, Gotshal & Manges shall be allowed reimbursement for expenses in the amount of $7,500. Liberty shall pay $5,000 for services rendered during the Liberty period.

*Application of O.C. Associates—Docket # 1065*

O.C. Associates seeks reimbursement of expenses of $100,000 incurred in its participation herein, particularly with respect to its presentation concerning valuation. The Court has already noted that it did not find O.C. Associates' evidence concerning valuation to be particularly helpful to the Court because of its rather extreme position. The application of O.C. Associates for reimbursement of costs and expenses is allowed for $50,000.

*Applications of Craig & Macauley and Agents of Majority Shareholders— Docket Nos. 1047, 1048, 1049, 1050, 1051*

The firm of Craig & Macauley represented Glen Corporation, the Majority Shareholder in CIC, and its owners, Monte and Neil Wallace. As did Weil, Gotshal & Manges, Craig & Macauley has declined to seek compensation for all services rendered in these proceedings, but has included in its request for compensation only those services it believes to meet the standards of Bankruptcy Rule 10–215. The Court, however, must make its own determination and finds that not all of the services for which Craig & Macauley seeks compensation were beneficial to the estate.

The Court cannot help but recall the self-serving and disruptive activities undertaken by Craig & Macauley on behalf of the Majority Shareholders prior to the presentation of the Trustee's Third Modified Plan. Three successive appeals were taken and lost by the Majority Shareholders before the United States Court of Appeals for the First Circuit, until the First Circuit was finally provoked to award double costs against the Wallaces. Numerous plan proposals submitted on the stockholders' behalf by Craig & Macauley occupied the time of the Court and the Trustee and his counsel, hindered an amicable resolution of these proceedings, and failed to benefit the estate; nor was the inflated valuation presented on behalf of the Majority Shareholders of great benefit to the Court or the estate. The challenge to the SEC's Advisory Report and the aborted appeal of the order finding the Trustee's First Modified Plan worthy of consideration delayed the proceeding without providing any discernible benefit. These activities were obstructive and costly to the estate, and motivated purely by self-interest.

The Court notes that stockholders were also represented herein by the Minority Stockholders' Committee, and duplication of effort could have been avoided by closer cooperation between the stockholder representatives.

---

**13.** The applicants, except for Weil, Gotshal and Manges, and Craig and Macauley, did not screen their applications, leaving this task to the Court.

It cannot be denied that the purchase of CIC by Liberty made possible the successful conclusion of this reorganization, and all parties agree that the Majority Stockholders must be given credit for securing the Liberty offer. The activities of Craig & Macauley in respect of the Liberty purchase were clearly of benefit to the estate. Compensation sought by Craig & Macauley is in the amount of $171,245.00.

The Court finds reasonable compensation for those services rendered by Craig & Macauley that were of benefit to the estate to be $110,000 and Craig & Macauley shall have reimbursement of its expenses in the amount of $17,123.37. Liberty shall pay $25,000 for the services rendered during the Liberty period. The services performed during this period were almost entirely compensable.

Four persons were retained as financial advisors to the Majority Shareholders and compensation for their services and reimbursement of their expenses is also requested. As noted earlier, their opinions were of limited value to the Court. The total sought is $193,387.50. These applications are allowed in the following amounts: on the application of Allan R. Finlay, $30,000 as compensation and $70.32 for expenses. Most of the work done by Mr. Finlay was general advice for the Wallaces' benefit. On the application of Robert G. Wiese, $5,000 is allowed as compensation. His services were similar to those rendered by Mr. Finlay. On the application of Robert S. Yoder, P.S.C., $15,000 as compensation and $3,000 for expenses is allowed. On the application of Massachusetts Fiduciary Advisors, Inc., $40,000 as compensation and $831.36 for expenses is allowed. Liberty will reimburse $2,000 of the Massachusetts Fiduciary Advisors, Inc. allowance for services rendered during the Liberty period.

### Application of Hale, Sanderson, Byrnes & Morton Docket # 1063

The firm of Hale, Sanderson, Byrnes & Morton (Hale, Sanderson) represented a Committee of Minority Shareholders in CIC. Hale, Sanderson has not excluded from its request for compensation any activities pursued solely on its clients' behalf, and its activities include actions that provided benefit primarily to its clients rather than to the estate. For example, Hale, Sanderson requests compensation for time spent providing information to committee members, opposing the compromise with the bank creditors, and preparing reorganization plans favorable to the interests of the shareholders. Hale, Sanderson spent time attempting to incorporate the Liberty purchase offer into a plan of reorganization, even before the purchase agreement with Liberty had been fully negotiated. The Minority Shareholders' attempt to subordinate the Majority Shareholders, made even after the Trustee's investigation had shown no basis for such subordination, clearly was without benefit to the estate. Again the Court notes duplication of effort among the representatives of the stockholders, duplication which should not be compensated from the estate. Compensation is sought in the amount of $134,570.00.

The Court finds that reasonable compensation for services rendered by Hale, Sanderson, Byrnes & Morton to be $75,000 and the firm is to be reimbursed for its expenses in the amount of $2,250.00. Liberty shall reimburse the estate $7,500.00 for services rendered during the Liberty period.

### Application of Ropes & Gray—Chapter XI Docket

Ropes & Gray served as counsel to the debtor during the Chapter XI period, and Bankruptcy Judge Glennon referred to our consideration the balance of Ropes & Gray's request for allowance of compensation for such service. Ropes & Gray received payments of approximately $254,000 for Chapter XI services and seeks a balance of $41,112.50 largely for services in negotiating a settlement with the SEC of the latter's efforts to convert this case to Chapter X. While the negotiations were successful and caused Ropes & Gray to draft proxy materials, the settlement failed. The other work done by Ropes & Gray during the Chapter XI proceedings was general corporate work

which was of benefit to this estate insofar as it facilitated and assisted in an orderly transfer of the management to the Trustee. Therefore, the application is allowed in the amount of $30,000.

*Application of Price Waterhouse—Docket # 1064*

Price Waterhouse was formerly the auditor for CIC. It seeks compensation for services performed during the Chapter X period primarily with respect to its advice and consultation with the successor auditor and assistance with various tax matters. Price Waterhouse also asks the Court to order the payment of the balance of its request for allowance during the Chapter XI period, a balance referred to this Court's consideration by Bankruptcy Judge Glennon. Services performed during the Chapter XI period include a review of drafts of the proxy statement for the proposed restructuring of CIC's debt, examination of CIC's financial statements for the year ended December 31, 1977 and assistance with tax matters. This application is allowed for $26,662, and expenses of $208.92 are allowed.

*Application of ConVest Energy Corporation—Docket # 1085*

ConVest Energy Corporation, a former subsidiary of CIC, was reacquired by the Trustee from Liberty after Liberty's purchase of CIC. It seeks reimbursement for expenses of $5,158.84 associated with a transitional meeting of its Board of Directors to smooth its disassociation from CIC. The Court fails to see why the cost of this meeting of the Board of Directors should be borne by the estate, and the application of ConVest Energy Corporation for reimbursement of expenses incurred in connection therewith is denied.

*Conclusion*

The foregoing constitutes my findings and conclusions pursuant to Fed.R.Civ.P. 52(a).

A separate order will be entered on the various applications in accordance with the above. Trustee's Counsel is directed to prepare such orders forthwith.