**George E. MILES, Plaintiff, Appellant,**

v.

**George SAMPSON, Etc., et al.,
Defendants, Appellees.**

**No. 81–1213.**

United States Court of Appeals,
First Circuit.

Argued Dec. 8, 1981.

Decided March 25, 1982.

---

Robert A. Backus, Manchester, N. H., with whom O'Neill & Backus, Manchester, N. H., was on brief, for appellant.

Carleton Eldredge, Rockingham County Atty., for appellees.

Before COFFIN, Chief Judge, ALDRICH and BREYER, Circuit Judges.

BREYER, Circuit Judge.

The court below awarded fees to appellant's attorneys for their efforts in his civil rights action against officials in charge of the Rockingham County Jail. The award, however, was for less than the full amount requested. The attorneys now challenge the reduced award on a number of grounds. We find none of the objections to be meritorious, and therefore affirm.

I

In November 1977, the appellant, George Miles, brought a *pro se* complaint against Rockingham County, New Hampshire, officials alleging that he was being kept in solitary confinement under conditions so poor as to constitute cruel and unusual punishment, that he had not been allowed medical treatment despite repeated requests, and that he was denied the right to confer with his attorney. A reviewing magistrate noted that he "does not contest the basis or the length of his confinement, but complains about the conditions of his confinement." Ronald Cook entered the case as Miles' attorney in February 1979, and in July 1979 he filed an amended complaint. That complaint listed four causes of action: 1) The "due process" clause required that Miles be given a hearing before being sent to solitary confinement. 2) He was kept in solitary confinement under conditions that constituted "cruel and unusual punishment." 3) Defendants subjected him to "violent and physical abuse" in violation of the Eighth Amendment. 4) Defendants unconstitutionally deprived him of his right to consult with his attorney. The complaint also referred to unconstitutional denial of medical attention. Plaintiff sought declaratory relief, actual damages, $10,000 puni-

tive damages against each of six defendants, costs and attorneys' fees.

About eighteen months later, after considerable negotiation and legal maneuvering, Miles and the defendants agreed to the entry of a consent judgment. The consent decree consists of a lengthy recitation of facts, in part setting forth defendants' views about what happened and why they feel they behaved correctly.[1] It provides Miles with no relief as to his claims of physical abuse, unconstitutionally poor conditions or isolation from counsel—indeed, it denies that any such claims of his are justified. It contains an admission, however, that the defendants violated a term of a court order in *Feeley v. Sampson*, No. 75–171 (D.N.H. Sept. 24, 1976), *vacated and remanded in part, and rev'd in part, on aspects of the order not relevant here*, 570 F.2d 364 (1st Cir. 1978), which required, for constitutional reasons, that due process (some form of hearing) be given in any instance of solitary confinement lasting more than twenty-four hours.[2] Miles' confinement lasted seven days in one instance and three days in another. The consent decree recognizes that this was unlawful under the rules previously promulgated pursuant to the district court's order, and it states that Miles' detention beyond twenty-four hours in each instance was therefore "technically" unlawful. The decree awards Miles no damages or any other relief, but reserves the question as to what fees and costs will go to the attorneys.

Miles' attorneys by then consisted of Ronald Cook, Susan Denenberg, who was admitted to practice on October 1980, two months before the case was resolved, and Richard Silber, a law student "intern." They petitioned for an award of about $9,400 in attorneys' fees, which the Civil Rights Attorney's Fees Award Act of 1976 grants in the "court[s] . . . discretion" to "the prevailing party." 42 U.S.C. § 1988.

The district court reviewed the petition for fees and the accompanying affidavits, claiming a total of 270.4 hours worked on the case (Cook: 140.5; Denenberg: 40.9; Silber: 89). It then disallowed a number of the hours for which compensation was sought (without indicating precisely which hours were disallowed) and reduced the rate of requested compensation (uniformly as to Silber and Denenberg and by varying amounts for various types of work done by Cook). It awarded roughly $2,700 in fees. The attorneys submitted a motion for clarification to find out which hours had been disallowed, which allowable hours were compensated at less than the requested rates, and what the court intended to do about reimbursement for costs. Shortly thereafter, but before the court had responded to the motion, the attorneys filed this appeal. The district court then responded to the motion for clarification by providing a line-by-line breakdown of the fee award. Although filed before the responsive order issued, this appeal in substance challenges both the initial fee award

---

1. Appellant was serving a thirty-day sentence on a misdemeanor conviction and simultaneously awaiting arraignment and trial on a felony charge. He was placed in solitary confinement for refusing work orders from officers at the jail.

   The first time he refused such an order, he apparently "taunted" the officer in charge and suggested the officer "was not capable of enforcing his order." The officer then tried to lock appellant up in his cell. Appellant resisted and threw a stool across a room, pulled dishes from a closet, tipped over one table and threw another across the kitchen. Once in confinement, appellant tried to clog up the plumbing and to cover a closed circuit television camera with his clothing. He also removed a metal drain cover from the floor of the cell, threw it

at the camera, and brandished it at an officer who tried to take it away from him. The *second time he refused a work order, appellant* again resisted the efforts of an officer to lock him up. He relented, however, when sheriff's deputies were summoned to help. He received no medical attention because, in the words of the consent decree, "defendants were unaware of any request for or need of any." The decree also states, "Miles was isolated because he refused a lawful order to work and behaved in a violent, disruptive and irrational manner."

2. Recognizing the occasional need to act swiftly to maintain institutional security, the court order permits the isolation of jailees in certain circumstances up to 24 hours without "disciplinary due process."

order and the more detailed, explanatory response.

## II

At the outset one might question whether appellant was the "prevailing party." Miles lost as to all his original claims; he received no damages; he obtained only an acknowledgement of correctness on the "due process" point. Miles is unlikely to have benefited from the acknowledgment since he had long since been released from solitary; nor is it clear from the record that anyone else benefited, for defendants were already in the process of introducing the "due process" reforms required by the decree in *Feeley v. Sampson, supra.* The district court, however, concluded that Miles prevailed on at least one of the significant issues in the litigation, and this finding is not challenged on appeal.

■ Nonetheless, we note, as did the court, that "the amount of attorney's fees" awarded "should be based on the work performed on the issues in which they were successful." *Nadeau v. Helgemoe,* 581 F.2d 275, 279 (1st Cir. 1978). The attorneys' affidavits before us make no distinction as among issues on which time was spent, despite the fact that we stated clearly in *Nadeau,*

> As for the future, we would not view with sympathy any claim that a district court abused its discretion in awarding unreasonably low attorney's fees in a suit in which plaintiffs were only partially successful if counsel's records do not provide a proper basis for determining how much time was spent on particular claims.

581 F.2d at 279. Thus, the district court's curtailment of the requested attorneys' fees might be sustained simply as an effort to separate the "successful" from the "unsuccessful" time. The district court does not explicitly state that it is doing this, but it does refer to certain hours as "duplicative," implying they were of little value. At a minimum, the attorneys' mixed record of success, and the failure of their affidavits to reflect this record, lead us to view their claim with the promised lack of sympathy. *Nadeau v. Helgemoe, supra.*

## III

■ We now turn to appellant's attorneys' specific arguments. They first state the district court erred in failing to apply the so-called "lodestar" method of fee calculation. Under this method, there are two principal steps to computing an award of fees. First, a "lodestar" fee is determined by multiplying a reasonable hourly rate by the number of hours reasonably expended on the lawsuit. Second, the "lodestar" is adjusted up or down to reflect factors, such as the contingent nature of success in the lawsuit or the quality of legal representation, which have not *already* been taken into account in computing the "lodestar" and which are shown to warrant the adjustment by the party proposing it. *See Copeland v. Marshall,* 641 F.2d 880, 890–91, 892 (D.C.Cir.1980) (en banc). The technique was pioneered by the Third Circuit in *Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.,* 487 F.2d 161 (3d Cir. 1973), and *Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.,* 540 F.2d 102 (3d Cir. 1976) (en banc), and approved by this circuit in *Furtado v. Bishop,* 635 F.2d 915 (1st Cir. 1980). *See also Copeland v. Marshall, supra.*

Although the district judge was evidently unaware of the *Furtado* opinion (two months after *Furtado* was released), we find no critical violation of any principle laid down in that decision. *Furtado* did not overrule *King v. Greenblatt,* 560 F.2d 1024 (1st Cir. 1977), *cert. denied,* 438 U.S. 916, 98 S.Ct. 3146, 57 L.Ed.2d 1161 (1978), the case followed by the district court. Indeed, in an earlier brush with the *Furtado* litigation, *see Furtado v. Bishop,* 604 F.2d 80 (1st Cir. 1979), *cert. denied,* 444 U.S. 1035, 100 S.Ct. 710, 62 L.Ed.2d 672 (1980), this court specifically requested the district court's views on the factors identified in *Greenblatt. See Furtado v. Bishop,* 635 F.2d at 916. In any case, the district court followed the "lodestar" method in its essentials. As is plain from the later line-by-line itemization, the

district court reviewed the fee request in painstaking detail. It determined the hours that were reasonably spent on the successful aspects of this litigation, it determined what it felt were reasonable rates of pay for the time so spent, and it multiplied the two together to arrive at a "lodestar" fee. No adjustment in this fee to reflect special, otherwise unrecognized factors, was sought and none was made.

The attorneys' real objection, however, is to the fact that the district court "discounted" the rate of compensation applicable to some of the work performed by lead counsel, Ronald Cook. It applied a rate of $50 per hour for some services (*e.g.*, court attendance, drafting of the consent decree), $25 per hour for others (*e.g.*, certain legal research, a conference with a law student intern, preparation for a deposition), $20 for others (*e.g.*, certain telephone conferences, review of a motion) and $10 for others (*e.g.*, other legal research, the drafting of interrogatories and various other papers, travel). The attorneys maintain that there was no basis for distinguishing among the work performed by a single attorney.

If the attorneys mean that not even *gross* "hourly rate" distinctions can be made in accordance with the type of legal work performed, they are wrong. *Furtado* states that calculating the "lodestar" (number of hours reasonably expended times reasonable hourly rate) involves "separating out work done in relation to a firm's hierarchy ... and ... assigning appropriate hourly rates for the *kinds of work* done by those at different levels of expertise." 635 F.2d at 920 (emphasis added). And, *Copeland* makes clear that different hourly rates are appropriate when the same attorney performs different kinds of work. 641 F.2d at 892.

More likely, however, the attorneys mean that in reducing the fee to eliminate excess, and other unreasonable, time or effort, the district court must shave the *hours*, as *Furtado* illustrates by example, rather than shave the *fee per hour* charged, as was done here. The shaving in this case had to reflect two kinds of judgment: whether claimed work had any relation to an issue on which the client prevailed and whether, if so, the time claimed is in excess of what reasonably should have been invested. If interrogatories, for example, related to issues on which the client lost, no compensation for such time should be allowed. If they related to an issue on which the client won, but involved far less difficulty and complexity than would justify the hours spent, the claimed compensation should be discounted. Ordinarily, and preferably, both adjustments are accomplished by a reduction in hours, but the same objectives can be achieved by applying varying rates. We do recognize a danger in the "hourly fee shaving" approach, namely, that the district judge may be tempted to "grade" in an overly refined manner the levels of skills or the quality of a lawyer's work, as say, "fair," "good," or "superior," by making correspondingly fine adjustments in the hourly rate. But, there is nothing before us here to indicate that such was the judge's purpose. To the contrary, the "hourly fee shaving" done here was for the purpose of reducing compensation insofar as work was unnecessary, or unrelated to a successful claim—precisely the purpose of the "hour shaving" approach illustrated in *Furtado*. In any event, given the mix of successful and unsuccessful claims, the attorneys' failure to differentiate in the affidavits, and the resulting probability, as the district court found, that full compensation for the hours claimed would reward work unrelated to a successful claim or duplicative and excessive work, we find that the district court did not abuse its discretion in arriving at the amount of the fee award.

Finally, the attorneys claim the district court erred in not holding a hearing on the fee issue. The short and conclusive answer to appellant's attorneys' "hearing" argument is that they never asked for one. While a hearing is often helpful in deciding on an appropriate fee award, *Copeland v. Marshall*, 641 F.2d at 892, 905; *Furtado v. Bishop*, 635 F.2d at 920; *Kargman v. Sullivan*, 589 F.2d 63, 67 (1st Cir. 1978); *see also Perkins v. Standard Oil Co.*, 399 U.S. 222, 90 S.Ct. 1989, 26 L.Ed.2d 534 (1970); *Lindy Bros. Builders, Inc. v. American Radiator &*

*Standard Sanitary Corp.*, 487 F.2d at 169, no case holds that a hearing is mandatory. *See Kargman v. Sullivan*, 589 F.2d at 67; *Copeland v. Marshall*, 641 F.2d at 905. In this case, the court below ruled on the fee request after having been with the case from start to finish. It was familiar with the work that went into it on both sides. It has a far better sense than we for what time was or was not productively spent, and how much time it should or should not have taken to generate the papers and arguments it saw. Given these facts, it is too late in the day to seek a hearing for the first time on appeal. *See Kargman v. Sullivan*, 589 F.2d at 67; *Copeland v. Marshall*, 641 F.2d at 905.

For the reasons given above, we affirm the fee award of the district court. To that award, we add the sum of $396.85 for appellant's attorneys' costs and disbursements, which appears simply to have gotten lost in the shuffle. Attorneys' fees for this appeal are denied.

*So ordered.*