**In re BOLTON HALL NURSING HOME, et al., Debtors.**

**Bankruptcy No. 76–1395–L.**

United States Bankruptcy Court, D. Massachusetts.

May 15, 1984.

See also Bkrtcy., 31 B.R. 765.

## MEMORANDUM AND ORDER RE CASE CLOSINGS AND FINAL ALLOWANCES

THOMAS W. LAWLESS, Chief Judge.

These forty-eight (48) cases were commenced on May 26, 1976 with the filing of twenty-eight (28) voluntary petitions under Chapters XI and XII of the former Bankruptcy Act. Petitions by and against the remainder of the debtors were instituted in the following weeks. Because of the financial interrelationships among the debtors all of these cases were removed to this Court and jointly administered pursuant to Rules 117, 11–14 and 12–14.

Over $110,000,000 was administered during these proceedings and, although *In re GHR Energy Corp.*, (D.Mass.1982) involves approximately $1,400,000,000, I am convinced that the complexities encountered in the cases at hand have rarely, if ever, been equalled.

The debtors were engaged in the ownership, development and operation of health care facilities. Although their activities were concentrated in the states of Massachusetts, Connecticut, and New York, there were properties or related operations in at least five other states. When the cases commenced several buildings were under construction and there were twenty-three (23) operating skilled nursing homes providing residential health care to about 3000 patients and employing another 3000.

The principal difficulty which had to be faced in the reorganization of these debtors was the composition of the debtors' creditor interests. Each of the properties owned by the debtors was separately financed. All of the debtors' operating assets were encumbered by separate layers of real estate mortgages and separate levels of personal property liens. Unlike other reorganization proceedings involving more debt dollars and more dispersed operations, there was no cne class of creditors which could be dealt with through negotiations with one representative or committee or on the basis of one collection of financial information. Even some of the bank creditors who held mortgages upon more than one of the debtors' properties were partners with different participating banks in each loan and demanded separate consideration of each debtor's financial capacity.

When the debtors' motion for substantive consolidation was withdrawn in the face of nearly unanimous creditor opposition, the debtors were required to deal with their creditors in negotiations and litigation which focused upon the circumstances of each creditor and its debtor. All of these matters had to be addressed simultaneously and at the same time that the Trustees and Receivers appointed in these cases pursued a thorough investigation of the debtors' financial collapse which was ordered by this Court. In addition serious disputes often involving novel questions of law and complex accounting facts which developed between the debtors and various taxing authorities, public health regulatory agencies and Medicare and Medicaid rate setting authorities had to be addressed. One contract dispute with New York City alone required several days of trial and several written opinions by the Court before it was resolved by payment of $1.65 million to the debtors. *See Fisher, et al., v. Smith, et al.*, 23 B.R. 295 and 23 B.R. 307 (Bkrtcy.D. Mass.1982).

The result of all of these activities has been a remarkable success. Millions of dollars have been paid to taxing authorities and other priority creditors all of whom have been paid in full, in cash. About seventy million dollars in secured claims have been paid, by way of settlement or litigation or rearranged on terms acceptable to the secured creditors. Plans of arrangement have been confirmed in forty (40) of these cases and substantial distributions paid to general creditors. Attached hereto as Schedule A is a summary listing of the final disposition of these cases.

An Order for Notice Regarding Orders of Dismissal and Orders of Confirmation,

Hearing Concerning Applications for Final Allowances and Final Accounts of Trustees and Receivers, Final Meeting of Creditors and All Other Matters Relating to Case Closing was entered in these cases on August 17, 1983. This notice was mailed to all creditors and parties in interest and was published in the Boston Globe and the Wall Street Journal newspapers. Among other matters this notice provided as follows:

> Any interested party who wishes to object to the final allowances requested herein or to the final accounts of the Trustees and Receivers in these proceedings, or who wishes to raise any matter which should be disposed of before the conclusion of these cases must do so in writing on or before October 7, 1983 at 4:00 P.M. Any such writings shall be filed with the Clerk of the Court and served upon counsel to the Debtors and counsel to the Trustees at the addresses listed below. *Failure to file and serve such written notice shall be conclusive evidence that any objection or any issue which might have been so raised is waived and any claim arising therefrom against the Debtors, the Trustees and Receivers, the successor entities created under the confirmed plans or any of them will be forever barred.* (emphasis in original).

Pursuant to this notice a hearing was held on October 21, 1983. Prior to the hearing only three (3) objections were timely filed. One objection by a creditor was dismissed when, contrary to the assertions in the objection, the creditor could not produce evidence that it had timely filed proofs of claim. Cf. *In re G.L. Miller & Co.*, 45 F.2d 115 (2d Cir.1930). The second objection by the New York State Health Department was resolved by agreement of the parties pursuant to stipulation. The final objection, also by New York State involving claims in the case of Rosewood Gardens Health Related Facility, was the subject of a pre-trial order pursuant to which the new entity created under this debtor's plan has assumed responsibility for the defense of this claim and assumed payment responsibility in the event of liability in excess of posted security.

In these circumstances, the consideration of final allowances, final accounts and other matters related to closing these cases is appropriate.

*Final Allowances*

The often tedious and sometime unpleasant task of fee determinations is made more enjoyable when the Court has the opportunity to both award for a job well done and close forty-eight (48) cases. In these cases, applications for final compensation totalling $6,754,364.32 have been filed by sixty (60) firms of attorneys, accountants, and appraisers. Of this amount, $4,810,493.31 was paid in interim allowances during the administration of these cases and $1,943,871.01 is sought in final awards. Three firms have requested an upward adjustment of their "lodestar" rates.

The factors which this Court must consider in establishing final allowances are well-established in this Circuit and are set forth in the case of *Furtado v. Bishop*, 635 F.2d 915 (1st Cir.1980). Although these standards evolved in the context of awards of attorneys fees in civil rights litigation, they have been regularly applied in this Circuit in proceedings under the Bankruptcy Act. *See, e.g., In re Continental Investment Corporation*, 28 B.R. 972 (D.C.D. Mass.1982); *In re Idak Corporation*, 26 B.R. 793 (Bkrtcy.D.Mass.1982).

Essentially, the Court is required to conduct a two-step analysis of fee requests. First it must determine an appropriate "lodestar" amount or base fee by multiplying the number of hours reasonably expended on the case by the customary hourly rate of compensation. The "lodestar" amount is determined by considering such factors as time and labor reasonably required, customary fees billed, awards in similar cases, the experience and skill of the personnel involved and whether, considering the difficulties presented, the level of commitment was appropriate.

After the basic lodestar rate is established, increases or reductions of that rate have been considered by reference to the factors "which have not *already* been taken into account in computing the lodestar and which are shown to warrant the adjustment by the party proposing it." *Miles v. Sampson,* 675 F.2d 5, 8 (1st Cir.1982) (emphasis supplied), *quoted in In re Casco Bay Lines, Inc.* 25 B.R. 747, 756 (Bankr. 1st Cir.1982). Such factors may include, if they were not already taken into account when computing the lodestar, the contingent nature of success and the delay in receipt of payment. *See Copeland v. Marshall,* 641 F.2d 880, 892 (D.C.Cir.1980).

▇▇▇ The lodestar can be further adjusted to reflect the "quality of representation." This adjustment is appropriate "only when the representation is unusually good or bad, *taking into account the level of skill normally expected* of an attorney commanding the hourly rate used to compute the 'lodestar'." *Id.* (emphasis supplied). It is under the heading "quality of representation" that a bankruptcy court should particularly consider the results of the attorney's participation in the bankruptcy proceeding and the benefit to the estate to see if circumstances warrant adjustment of the lodestar amount. *In re Casco Bay Lines, Inc., supra,* at 756. *See Copeland v. Marshall, supra,* at 894. Where an attorney's services have produced particularly exceptional benefits for the estate—taking into account the hourly rate commanded and the number of hours expended—an upward adjustment of the lodestar may be warranted to compensate for an hourly rate that turned out to be overly conservative. Similarly, if a high-priced attorney performs in a competent but undistinguished manner a decrease in the hourly rate would be warranted. *Id.*

While these fee applications were under advisement, the Supreme Court issued its opinion in *Blum v. Stenson,* — U.S. —, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984). In that civil rights case, the Supreme Court held that an upward adjustment of the reasonable hourly rates was inappropriate

in the particular circumstances of that case. In *Blum,* the Supreme Court held that the fee applicants did not carry their burden of putting forth evidence, by affidavit or otherwise, supporting an upward adjustment.

The burden of proving that such an adjustment is necessary to the determination of a reasonable fee is on the fee applicant. The record before us contains no evidence supporting an upward adjustment to fees calculated under the basic standard of reasonable rates times reasonable hours. The affidavits of respondent's attorneys do not claim, or even mention, entitlement to a bonus or upward revision.

*Blum v. Stenson,* — U.S. —, —, 104 S.Ct. 1541, 1548, 79 L.Ed.2d 891 (1984).

The Supreme Court also found that the reasons offered by the District Court in *Blum* did not support an upward adjustment of the lodestar fee. In awarding the increase, the District Court had briefly referred to the complexity of the litigation, the novelty of the issues, the high quality of representation, the "great benefit" to the class, and the "riskiness" of the law suit. As to the first four factors cited by the District Court, the Supreme Court said these factors should not ordinarily provide independent bases for increasing the fee award because these factors are generally subsumed within those used to determine the lodestar amount. — U.S. at — —, 104 S.Ct. at 1548–49. The Supreme Court found that on the record before the District Court, its rationale for providing an upward adjustment is a clear example of "double counting." *Id.*

▇▇▇ *Blum* has been cited as effecting a "fundamental change in the law governing the award of attorneys' fees in section 1983 cases" by "circumscribing very severely upward adjustment of the lodestar figure." *May v. Cooperman,* 582 F.Supp. 1458 (D.N.J.1984). I do not read *Blum* so broadly. *Blum* specifically recognizes that "quality of representation" may justify an upward adjustment "where the fee applicant offers specific evidence to show that

the quality of service rendered was superior to that one reasonably should expect in light of the hourly rates charged and that the success was 'exceptional'." *Blum v. Stenson, supra,* —— U.S. at ——, 104 S.Ct. at 1549, *citing Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1984). In my opinion, besides articulating a succinct standard for determination of requested lodestar adjustments, *Blum* does not effectuate any major changes in the law governing fee allowances in bankruptcy cases in this Circuit. For example, it is well-established that the party proposing an adjustment to the lodestar has the burden of showing that it is warranted under the circumstances. *Miles v. Sampson, supra,* at 8. Second, adjustments to the lodestar are the exception and not the rule. *Id.* See also *Furtado v. Bishop,* 635 F.2d 915, 924 (1st Cir.1980). Third, the lodestar should not be adjusted upward or downward by factors that were already taken into account in determining the lodestar. *Miles v. Sampson, supra,* at 8. *See also In re Casco Bay Lines, Inc., supra,* at 756–757. Finally, the Supreme Court in *Blum* left open the question of whether the risk of nonpayment and other risk factors should be considered in making adjustments to the lodestar rate. *Blum v. Stenson, supra,* —— U.S. at ——, n. 17, 104 S.Ct. at 1550, n. 17. Accordingly, the rule of law in the First Circuit that risk of nonpayment and other risk factors are appropriate adjustment factors continues to govern in these proceedings to the extent applicable. *See Furtado v. Bishop, supra; Kennelly v. Lemoi,* 529 F.Supp. 140 (D.RI 1981); *See also Blum v. Stenson, supra,* —— U.S. at ——, 104 S.Ct. at 1550 (concurring opinion of J.J. Brennen and Marshall) (specifically supporting the position that the risk of not recovering attorney's fees is a proper basis on which to award an upward adjustment).

I have considered the standards set forth in *Furtado* with regard to each applicant. I am aware that although no objections to the applications for final awards were filed, the Court has an independent duty to examine the reasonableness of all fee requests. Because of the large number of applications to be considered, no useful purpose will be served by articulating in this memorandum a repetitive detailed analysis of the *Furtado* criteria with respect to each application. Instead, the Court will focus upon the major players in these proceedings and deal with applications for lesser amounts in less detailed fashion. With respect to applications for upward adjustments of the base rate, the Court will apply the *Blum* standard as set forth above.

### Counsel to the Debtors

I believe that the great share of credit for the successful conclusion of these cases is due to the efforts of Attorney Barry Portnoy and the law firm of Sullivan & Worcester, counsel to the debtors. To say that achieving the final result required an incredible effort is to understate the task. This was not one case with myriad problems but rather the reorganization of forty-eight (48) separate debtors wherein the problems were multiplied geometrically.

During the first two and one-half years of these proceedings these cases demanded substantially all of Attorney Portnoy's professional time. My own observations during innumerable hearings throughout this period indicate that he maintained complete command of all phases of the numerous negotiations and complex litigation which were on-going at that time. Without his commitment, it is likely that all of the forces pulling in different directions may have resulted in adjudications of the debtors followed by secured creditor's foreclosures and serious economic losses to all interested parties. Because of his efforts, Plans of Arrangement were confirmed for the majority of the debtors by the end of 1978.

Mr. Portnoy and Sullivan & Worcester were primarily responsible for the negotiations and implementations of the confirmed plans of arrangement. Some of the more complicated litigation involving Medicaid rate-setting disputes which directly impact-

ed upon the financial feasibility of the plans were handled successfully by these attorneys. During the course of these cases numerous obstacles were presented and were overcome by creative solutions presented by these attorneys. For example, to effect confirmation of one plan, certain assets and liabilities had to be transferred to a new limited partnership which was born a debtor in these proceedings and whose plan was subsequently confirmed. Moreover, in order to comply with New York State laws regarding licensure and establishment of health care facilities, a post-confirmation trustee was appointed so that creditors could be paid while State administrative procedures proceeded.

A review of time records submitted by Sullivan & Worcester indicates that attorneys and paralegal assistants at this firm devoted a total of 16,040.75 hours to these cases from May 1976 to today. The weighted average hourly rates charged by these personnel during this period was $70.78. A first reading of the more recent time records indicates that comparatively too much effort by relatively senior, high priced lawyers as opposed to junior, lower priced lawyers may have been allocated to these cases by Sullivan & Worcester. Upon closer review, however, it is apparent that it would not have been cost efficient to educate junior lawyers to the facts of these cases as the stature and billing rates of the attorneys such as Mr. Portnoy who were handling the cases increased during the years since 1976. Considering these facts, I find the time expended and the lodestar rate charged by this Applicant to have been appropriate.

The sworn Application for final allowance of fees and expenses filed by Sullivan & Worcester and the Memorandum in Support of their application requests the following upward adjustment of the hourly rates of the four principal attorneys who worked on these cases:

| Attorney | Range of Hourly Rates During Proceeding | Weighted Avg. Hourly Rate During Proceeding | Requested Adjusted Hourly Rate |
|---|---|---|---|
| (1) Barry M. Portnoy | $65–165 | $83.36 | $125 |
| (2) J. Christopher Robinson | $40–90 | $45.44 | $100 |
| (3) Kerry R. Lyne | $90–140 | $98.48 | $125 |
| (4) Joseph H. Newberg | $50–135 | $58.76 | $100 |

| | |
|---|---|
| Total Request: | $ 1,598,742.00 |
| Lodestar Allowed: | $ 1,049,913.39 |
| Upward Adjustment Requested: | $ 539,628.61 |

While I find that the quality of services rendered by Messrs. Robinson, Lyne and Newberg to have been highly competent, I do not find that the quality of service rendered was superior to that one reasonably should expect in light of the hourly rates charged. Accordingly, Sullivan & Worcester's request for an upward adjustment of these attorneys' hourly rates is denied. ▉ With respect to Mr. Portnoy, however, an upward adjustment of the lodestar is appropriate. During the seven and one-half years of these proceedings Mr. Portnoy devoted 7,380 hours to these cases at an average hourly rate of $83.86. Of course, the amount of time expended is not itself justification for upward adjustment of the lodestar rate. On the contrary, a downward adjustment is probably just as often appropriate in such cases. Rather, in these cases it is the nature and quality of the services performed in light of the hourly rates charged that warrant an upward adjustment.

As is fully attested to in the affidavit submitted with Sullivan & Worcester's fee application, the services performed have required extraordinary legal skills in the

areas of corporate finance, real estate law, medical and public health law, commercial transactions, bankruptcy law, tax law and litigation. For example: questions of both fact and law concerning the interrelations of Medicare and Medicaid rate laws and regulations and the former Bankruptcy Act had to be addressed, usually on a first impression basis, in the context of litigation. Separate negotiations with each class of each debtor's creditors were required to take place in the context of the complex business structure of the debtors, which contained a difficult tangle of general partnerships, limited partnerships, corporations, business trusts and sole proprietorships. The panoply of often conflicting creditors' interests active in these proceedings created almost continuous litigation during the early years of the proceedings and made the development of plans for the operating entities and individual debtors particularly difficult.

In sum, the quality of legal services rendered by Mr. Portnoy as lead attorney with primary responsibility in these cases was clearly superior to that one would expect in light of his charged hourly rates and fully justify the requested adjustment.

The second requirement for an upward adjustment of the basic rate is that the applicant's services accomplished a result that can be considered "exceptional." *See Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). Although the gross amounts involved in these cases were not as great as the amounts involved in certain other recently concluded arrangement and reorganization proceedings in this District, a straight-line equation between the amount involved and the success achieved is not necessarily appropriate. The results achieved in these cases, viewed from the perspective of the prospects of these debtors and their creditors on the day of the bankruptcy filings and in light of the opposition encountered, cannot be characterized as anything other than exceptional. The efforts of the fee applicants in these proceedings have produced the following results:

(a) Reorganization of thirty-six (36) of the entity debtors into on-going businesses operating in three different states and providing employment for over 3,400 persons and high quality resident health care to approximately 3,000 patients;

(b) Payment of approximately $4,000,000 in pre-petition tax claims and of substantial post-petition tax claims to various municipal, state and federal taxing authorities;

(c) Payment or assumption of approximately $50,000,000 of indebtedness to various secured creditors in rearrangement and satisfaction of their claims;

(d) Settlement and payment of millions of dollars of unsecured claims on a case by case basis by plans of arrangement which sometimes paid 100% depending upon the circumstances of individual debtors;

(e) Collection and disbursement of approximately $110,000,000 during the administration of these cases; and

(f) Return of ownership and control of all but three (3) of the operating businesses to the individual debtors.

By any standard, from the point of view of debtors' counsel, such results must be considered "exceptional." Because Mr. Portnoy's efforts were primarily responsible for the results obtained, the lodestar adjustment may be accomplished by raising his hourly rate throughout these proceedings to $125/hour, a substantial premium, but a figure which is still well below his current usual billing rate.

For these reasons, including the extraordinary time commitment made by Mr. Portnoy in the first two and one-half years of these proceedings in the face of a very real risk of nonpayment, *see Furtado v. Bishop, supra,* Attorney Barry M. Portnoy and the law firm of Sullivan & Worcester are awarded a final fee of $1,442,667.49 of which amount $999,058.64 has been previously paid as interim allowances and $443,-608.85 is to be paid. In addition, this applicant is allowed final reimbursement of expenses of $86,624.07 of which amount $68,-

991.11 has been previously paid leaving a balance of $17,632.96 to be paid.

*Counsel to the Trustees and Receivers*

During these proceedings the trustees and receivers appointed for the various debtors have been ably represented by counsel. Several such counsel made major contributions to these proceedings and are deserving of special mention.

The firm of Goldstein & Manello was counsel to trustees/receivers Fisher, Langan and Maguire throughout these proceedings. At the commencement of these cases the laboring oar for work assigned to this firm was pulled by Attorney Daniel Glosband. Attorney Glosband is presently chairman of the Massachusetts Bar Association Committee on Reorganization and he is generally recognized as a young but leading practitioner of this area of the law in New England. *See In re Continental Investment Corporation, supra,* 28 B.R. at 984, n. 12. His services in these cases were diligently and efficiently performed. When Mr. Glosband was otherwise occupied during the past few years, the work assigned to this firm was performed largely by Attorney Robert Somma who, although less experienced than Mr. Glosband, was equally proficient.

Among other matters, Goldstein & Manello was primarily responsible for representing the trustee/receivers in litigation, negotiation and settlement with the federal, state and over two dozen local taxing authorities in connection with substantial priority and lien claims owed by the debtors. Such settlements produced tax savings to the debtors and their estates well in excess of $500,000 and materially contributed to the ultimate feasibility of the debtors' reorganization and their viable post-reorganization efforts.

Goldstein & Manello assisted and advised the trustees/receivers in their negotiation, litigation and settlement with both federal and state agencies regulating the management, operation and participation of the debtors' nursing homes and health care facilities in the federal Medicare program and the Medicaid programs of Massachusetts, Connecticut, the State of New York and the City of New York. A brief and partial listing of the matters involved includes successful resistance to federal and state attempts to effectuate improper offsets of pre-Proceedings claims against post-Proceedings revenues; successful collection of over $500,000 in accounts receivable from state agencies for nursing and health care services rendered to Medicaid patients; resolution of complicated disputes in respect of interim and final rates for such services; resolution of disputes regarding compliance by the debtors' nursing homes and health care facilities with federal and state regulations governing the safety and welfare of patients resident in such homes and facilities; and the successful collection of $1.65 million in breach of contract damages from the City and State of New York after a lengthy trial.

The time records submitted indicate that attorney and paralegal personnel at Goldstein & Manello devoted 7,585.3 hours to these cases at a weighted average hourly rate since 1976 of $62.15 per hour. Considering the tasks delineated above and the eight other major tasks performed by this applicant in these proceedings (as documented in Goldstein & Manello's verified fee application), I find the time expended and the lodestar rate to be justified.

In its sworn application for final allowances, Goldstein & Manello requests an increase of the firm's mixed hourly rate for its services herein from $62.15 to $75. The adjustment to the lodestar fee produced by application of the requested $75 mixed hourly rate is $97,502.63.

Under the circumstances, I disfavor any such across the board increase of the mixed hourly rate of the fourteen professionals who worked on these proceedings at Goldstein & Manello. I am unable to find from the submissions of this applicant or from my observations that the service rendered by each of these individuals who worked on these cases was superior to that one would expect in light of their charged hourly rates.

As to Messrs. Glosband and Somma, however, my observation and review of the work performed and the fully detailed and extensive chronological narratives, related summaries and affidavits submitted by this applicant provide an evidentiary basis for an upward adjustment of these two attorneys' base hourly rates. The services rendered by these two attorneys played a major role in achieving the 'exceptional' results previously documented herein and fully satisfy the "success" requirement of *Blum*.

Additionally, it is clear that a degree of innovation, novelty and deliberation far superior to their billed hourly rates was exhibited by Mr. Glosband and Mr. Somma in their work in these proceedings. For example, the innovative tax litigation/settlement procedure developed by Mr. Glosband produced substantial tax savings for these estates at a cost substantially less than that incurred if conventional techniques and tactics had been employed. Mr. Glosband's work in this area set standards that were followed in other major First Circuit reorganization cases and was clearly superior to that one would expect in light of his billed hourly rate. An adjustment of his lodestar hourly rate of $72.48 to $90.00 is justified under these circumstances.

As to Mr. Somma, the services rendered by him as the principal attorney in the contract litigation with New York City and New York State was also superior to that one would expect from his charged hourly rate. The legal analysis developed and employed by him, as well as his extraordinary commitment to detail, resulted in a full vindication of the rights asserted by the debtors and their estates. The appeal of the multi-million dollar judgment that was produced by Mr. Somma's efforts was ultimately compromised for an amount that preserved all but a fractional portion of the original judgment. Accordingly, Mr. Somma's hourly rate of $91.05 is hereby adjusted upward to $100.

In view of the above, the lodestar fee of Goldstein & Manello is adjusted upward by $48,405.90. Accordingly, final fees are awarded to the firm of Goldstein & Manello in the amount of $519,800.83 of which amount $412,518.85 has been previously paid and a balance of $107,281.98 is to be paid. In addition, final reimbursement in the amount of $26,473.68 is awarded to this applicant of which $23,976.70 has been paid and $2,496.88 is to be paid.

Attorney William F. Macauley and the law firm of Craig and Macauley served as counsel to the trustees, Joseph W. Bartlett and J. Joseph Maloney. Attorney Macauley was responsible for the Court ordered investigation of the allegations of improper conduct which were leveled against the debtors at the commencement of these cases. His findings were essential background for the Court and the creditors to proceed with plans which returned control of the debtors to their pre-filing owners. The combination of firmness and fairness which Mr. Macauley brought to this task was an essential underpinning for the successful financial rehabilitations achieved in these cases.

In addition to his investigative responsibilities, Attorney Macauley served as counsel to the trustee for four of the operating limited partnership debtors. When wrongdoing by the non-debtor general partners was established, his efforts established on a first impression basis the equitable principal that in appropriate circumstances a limited partner can assume control of reorganization efforts. *See In re Brookhollow Associates, et al.*, 575 F.2d 1003 (1st Cir. 1978). His litigation success formed the basis upon which successful plans for the businesses operated by these partnerships were presented.

The time records submitted indicate that Mr. Macauley and members of his firm devoted a total of 4,473.6 hours to these cases which were billed at a weighted average hourly rate of $67.75/hr. Applying the *Furtado* standards, I find the time and rate appropriate.

In its sworn application for final allowances, Craig and Macauley requests an upward adjustment of the weighted average hourly rates of both attorney Macauley

(2,192.2 hours at $74.44/hr.) and attorney Craig (200.4 hours at $100/hr.) to $100/hr. and $110/hr., respectively. The adjustment to the lodestar fee produced by application of these requested hourly rates is $58,036.63. Craig and Macauley also requests the establishment of a flat $60 hourly rate for all associate time spent on these proceedings. The net adjustment to the lodestar fee produced by application of this $60 hourly rate to all associate time is an increase in the lodestar fee in the amount of $37,078.49.

The requests for upward adjustment of the billed hourly rates of both Attorney Craig and the various associates are denied because I do not find that the quality of services rendered by these applicants superior to that one would expect from their charged hourly rates. However, the quality of services rendered by Mr. Macauley and the exceptional results achieved from his services in light of the amount charged warrant upward adjustment of his lodestar rate.

 This applicant's novel legal approach to the partnership issue enabled a reorganization of the four partnership debtors to take place in spite of the refusal of two of the three general partners to assent to the petitions under Chapter XII. The results obtained in the partnership proceedings were exceptional in light of the constant opposition to the filings, which required Attorney Macauley's successful participation in eleven appeals to the District Court and First Circuit. Further, at the time Mr. Macauley became involved, these four debtors had already been adjudicated and secured parties were claiming liens on all of the assets. Mr. Macauley was successful in converting these cases and in holding off the secured creditors long enough to amass funds to pay all secured and unsecured creditors. In sum, the services performed and the results achieved warrant the upward adjustment of Attorney Macauley's hourly rate from $74.44 to $100, an upward adjustment of Craig and Macauley's fee in the amount of $56,032.63.

Accordingly, this applicant is awarded a final fee of $345,606.63 of which $261,-158.54 has been paid and $84,448.09 is to be paid. In addition, $9,254.35 in final reimbursement is awarded to this applicant of which amount $8,626.10 has been paid and $598.26 is to be paid.

Attorney Irving Widett served as senior counsel to the trustees and receivers throughout these proceedings. Attorney Widett has been a leader of Boston area insolvency and commercial law practitioners during the past forty years. Throughout this Court's regular observation of Mr. Widett's work during these years he has approached every case with enthusiasm and ingenuity. Whether he was representing a prominent citizen who was serving as a court appointed fiduciary or acting for an impecunious debtor with little hope of compensation, Attorney Widett has given every client dedicated high quality service. His service in these cases was marked by the same professionalism.

In these cases Mr. Widett and his firm were primarily charged with the day-to-day work of bankruptcy administration. It was his job to locate and recover preferences and fraudulent transfers, to review and dispute claims where appropriate, to keep creditors and other parties in interest advised of the progress of these cases, and to negotiate and implement the day-to-day compromises with suppliers which were essential to maintain the viability of the debtors' businesses. Lest these tasks sound mundane, it should be emphasized that millions of dollars were involved in reviewing claims in these cases and settlements with essential suppliers often raised life-threatening emergencies to the hundreds of patients who were dependent upon the debtors for residential health care.

At the time these cases commenced Mr. Widett was a senior partner of the law firm of Widett, Widett, Slater & Goldman. In 1979 he was the founding partner of Widett & Glazier. Widett, Widett, Slater & Goldman has been paid in full by interim awards in these cases and those payments ($348,756.86 in fees and $19,169.65 in reim-

bursement) are hereby confirmed as final. A review of the fee applications submitted by Widett & Glazier indicate that Mr. Widett has billed his time devoted to these cases since 1980 at an average hourly rate of $162.30/hr., a rate which this Court considers appropriate for an attorney of his experience and standing in the community. These applications also reveal that other attorneys at this firm charged since September, 1979, the weighted average hourly rate of $80.75/hr. These other attorneys were quite junior and the type of work which they performed toward the conclusion of these cases was not particularly complicated or time sensitive. Therefore, I find that an appropriate lodestar hourly rate for attorneys at Widett & Glazier who worked on these cases since September, 1979 other than Mr. Widett was $50/hr. For the foregoing reason, Attorney Irving Widett and the firm of Widett & Glazier are awarded final compensation of $87,463.75 of which $46,800 has been paid leaving $40,663.75 as a balance to be paid, and final reimbursement of $1,918.40 of which $1,621.14 has been paid and $297.26 is to be paid.

*The Trustees and Receivers*

At the commencement of these cases it was apparent that the appointment of trustees and receivers was required to stabilize the debtors' operations and instill confidence in their viability among their patients, creditors and the affected public generally. Because of real and potential conflicts of interest among the jointly administered estates, because of the time commitments required and because of resignations during the seven and one-half years which these cases have been pending, several persons have served as trustees or receivers of the various debtors.

Frederick G. Fisher, Jr., was appointed a trustee and receiver of many of these debtors on June 4, 1976 and served in that capacity throughout these proceedings. Mr. Fisher is a senior partner of the Boston law firm of Hale & Dorr. He is a past president of the Massachusetts Bar Association and he is now and has been for several years a Massachusetts State Delegate to the House of Delegates of the American Bar Association. In the 1960's Mr. Fisher was the first prominent attorney in a major Boston law firm to regularly practice insolvency law. Today his firm has one of the largest insolvency practices in New England and Mr. Fisher has a national, and indeed international, reputation as an insolvency and commercial law expert.

James M. Langan also served as a trustee and receiver throughout these proceedings. Mr. Langan served as a Special Justice of the Massachusetts District Courts from 1947 until his retirement. Because of the ethical limitations created by his public service, Mr. Langan's law practice was particularly suited for fiduciary service and he has developed considerable expertise in bankruptcy administration over the years. This Court and others have frequently called upon Judge Langan when faced with the need to create an immediate perception of integrity such as was required in these cases.

Richard Maguire served as a trustee and receiver in certain of these cases until he resigned prior to his death in early 1983. Mr. Maguire was a founding partner of the Boston law firm of Maguire, Roach and Leen. In the early 1960's he served as Treasurer of the Democratic National Committee and played a prominent role in local and national public affairs. At the time of his appointment Mr. Maguire had largely retired from the active practice of law and he was able to devote considerable time to supervising the debtors' operations in the early, crucial years of these proceedings.

Joseph W. Bartlett served as a trustee in five of these cases from September, 1976 through December 1977. Mr. Bartlett was a law clerk to the late Chief Justice Earl Warren, he was general counsel to the United States Department of Commerce in the 1960's, he has served as President of the Boston Bar Association and is presently a prominent practitioner in both Boston and New York City. Mr. Bartlett supervised the investigatory work undertaken by at-

torney William Macauley in these proceedings and added to its credibility and impact.

J. Joseph Maloney replaced Mr. Bartlett as a trustee in these cases in January, 1978 and served until the conclusion of these cases. Mr. Maloney had served as co-counsel to Mr. Bartlett prior to his resignation and his willingness to serve as trustee allowed an efficient transition. Besides maintaining a successful general practice of law with the firm of Maloney, Gallagher and Desmond, Mr. Maloney is a prominent member of the Boston business community and serves as chairman of a local savings bank. The Court has no doubt that Mr. Maloney's practical business advice was of considerable value in bringing the debtors and creditors together to formulate successful plans in those cases in which he served.

■ This Court believes that in applying the *Furtado* analysis to compensation to be paid trustees and receivers particular emphasis should be placed upon the responsibility assumed. The Court must recognize that it is in part employing the reputation of the individuals who accept its appointments. In the present cases the responsibilities assumed were enormous and the reputations for integrity and high ability which these individuals brought with them made material contributions to the successful conclusions of these cases.

On April 6, 7 and 12, 1977, the Court conducted evidentiary hearings on the first applications for interim allowances of compensation for Messrs. Fisher, Langan and Maguire. Hotly contested by the various mortgagees in these proceedings, the requests for interim allowances were ultimately allowed after considerable testimony and evidence regarding the value of comparable services in the marketplace. Richard D. Little, of the consulting firm of Arthur D. Little, Inc., testified that his firm would have charged approximately $250,000 to $275,000 for services analagous to the duties performed by the trustees and receivers in the first seven crucial months of these proceedings. At that time, I concluded that the interim requests were more than justified and the fairest measure of compensation for the heavy responsibilities assumed by these three individuals was most appropriately considered in the context of yearly salaries. The ultimate results achieved in these cases have more than justified the first interim awards and the several interim awards that have followed. However, at the same time, the Court recognizes that the burdens assumed by these trustees and receivers gradually lessened as these debtors emerged from these reorganization proceedings over the past several years. Accordingly, the Court establishes the following final rates of compensation for these applicants for the years in question:

## TRUSTEES/RECEIVERS: COMPENSATION

| Period/Established Final Rates | F. Fisher | J. Langan | R. Maguire |
|---|---|---|---|
| (1) June 1, 1976 to May 31, 1977: $325,000/year | $108,333 | $108,333 | $108,334 |
| (2) June 1, 1977 to May 31, 1978: $300,000/year | 100,000 | 100,000 | 100,000 |
| (3) June 1, 1978 to May 31, 1979: $275,000/year | 91,666 | 91,667 | 91,666 |
| (4) June 1, 1979 to May 31, 1980: $225,000/year | 75,000 | 75,000 | 75,000 |
| (5) June 1, 1980 to May 31, 1981: $175,000/year | 58,334 | 58,333 | 58,333 |
| (6) June 1, 1981 to May 31, 1982: $125,000/year | 55,000 | 55,000 | 15,000 [1] |
| (7) June 1, 1982 to May 31, 1983: $ 50,000/year | 25,000 | 25,000 | NONE |

| | | | |
|---|---|---|---|
| (8) June 1, 1983 to Sept. 30, 1983:<br>$50,000/year x 1/3 = 16,667 | 8,333 | 8,334 | NONE |
| Total<br>Total Compensation Allowed: $1,491,676<br>Interim Compensation Received: $1,251,618<br><u>BALANCE</u> <u>DUE</u>: $240,058 | 521,666<br>417,206<br>$104,460 | 521,667<br>417,206<br>$104,461 | 448,343<br>417,206<br>$ 31,137 |

1.) Mr. Maguire's performance of his duties during this period was severely curtailed by illness that ultimately led to his resignation in 1982 and his death in 1983.

To Joseph W. Bartlett, the prior awards totalling $57,636 in fees and $2,873.81 in reimbursement are confirmed as final. In addition, Mr. Bartlett is awarded further final compensation of $7,500.

To J. Joseph Maloney, the prior awards totalling $46,700 in fees and $2,642.25 in reimbursement are confirmed as final, and he is hereby awarded a further final allowance of $7,500.

*Other Applicants*

The majority of the remaining Applicants for final allowances were paid in full in interim allowances for services rendered during the course of these proceedings and now seek only to have their prior awards confirmed as final. After reviewing all these prior applications and interim orders for compensation, all such awards listed on Exhibit B hereto are hereby confirmed as final.

Those remaining Applicants who are seeking additional final compensation and confirmation of prior interim awards may be divided into two categories: special counsel or accountants to the debtors or the trustees and receivers who were engaged for specific tasks; and creditors' attorneys who are seeking compensation for services which contributed to the successful conclusion of these cases.

In reviewing the applications by counsel to the various secured creditors, the Court has tried carefully to distinguish between services which were rendered in pursuit of the separate interests of individual secured creditors and should be paid for by such creditors and services which truly contributed to the successful plan confirmations achieved or the administration of these cases generally. *See* Rule 12–28(a). Similarly, with regard to co-counsel for the Unsecured Creditors' Committee, the Court is aware that their participation was essential for the final conclusion of these cases, but it is equally aware that from the beginning of these cases it was apparent that these cases would be primarily concerned with the rearrangement of secured indebtedness under Chapter XII of the Bankruptcy Act, formerly 11 U.S.C. Section 801 *et seq.*

Having these considerations in mind and after applying the *Furtado*-type analysis to each of these Applicants, the following final allowances are awarded:

To Herbert C. Kahn for services as counsel to the trustee, prior awards of $6,000 in fees and $25 in reimbursement are confirmed as final, and an additional final fee of $1,000 is awarded.

To Riemer & Braunstein for services as co-counsel to the Unsecured Creditors' Committee, prior awards of $55,717 in fees and $1645.89 in reimbursement are confirmed as final, and an additional $17,500 in final fees and $1,187.65 in reimbursement are awarded.

To Silverman & Kudisch for services as co-counsel to the Unsecured Creditors' Committee, prior awards of $44,000 in fees and $1,682.88 in reimbursement are confirmed as final, and an additional $7,500 in final fees is awarded.

To Goodwin, Procter & Hoar for services as co-counsel to the Senior Mortgagees' Committee, prior awards of $29,600 in fees and $3,308.11 in reimbursement are confirmed as final and an additional $15,000 in final fees is awarded.

To Herrick & Smith for services as counsel to the Equipment Lenders' Committee, prior awards of $5,028 in fees and $1,156.06 in reimbursement are confirmed as final, and an additional $12,000 in final fees and $598.95 of reimbursement are awarded.

To Rackemann, Sawyer & Brewster for services as counsel to a secured creditor, prior awards of $21,000 in fees and $1,866.74 in reimbursement are confirmed as final, and an additional $5,000 in final fees is awarded.

To O'Connell & Aronowitz for services as special counsel to the debtors, prior awards of $6,000 in fees and $1,738.53 in reimbursement are confirmed as final, and an additional $6,000 in final fees to be paid by retention of a retainer is awarded.

To Segal, Roitman & Coleman for services as special counsel to the debtors, prior awards of $57,450 in fees and $829.20 in reimbursement are confirmed as final and an additional $1,500 in final fees is awarded.

To Whiteman, Osterman & Hanna for services as special counsel to the trustees, prior awards of $115,779 in fees and $7,679.49 in reimbursement are confirmed as final and an additional $9,474.87 in final fees and $266.61 in reimbursement are awarded.

To Kelleher & Co. for services as accountants to the trustees, prior awards of $144,273.25 in fees and $3,080.47 in reimbursement are confirmed as final and an additional $500 in final fees is awarded.

To Robert Bullard for services as disbursing agent, prior awards of $8,500 in fees and $1,610.46 in reimbursement are confirmed as final and an additional $1,500 in final fees is awarded.

*Closing Matters*

No objection was timely filed to the final accounts submitted by the trustees and receivers and they are allowed.

In accordance with the Order for Notice of August 17, 1983, all pending adversary proceedings and contested matters are dismissed with prejudice except only the pending dispute between the debtor Rosewood Gardens Health Related and New York State which is governed by the Pretrial Order of November 22, 1983. Any claim which could have been raised or asserted in these proceedings against the debtors, the trustees and receivers or the entities created pursuant to the confirmed plans of arrangement are forever barred and all creditors or other affected or concerned parties are forever permanently enjoined from pursuing such matters in this or any other court.

The final administration allowances awarded herein shall be paid from funds previously posted by the debtors and assembled in the disbursing agents' account for the debtor Medico Associates, Inc. The balance, if any, remaining in such account shall be disbursed to the successors to the debtors created under confirmed plans of arrangements in proportion to their respective contributions to this pooled account.

Except for jurisdiction retained under confirmed Plans of Arrangement, their respective orders of confirmation and pursuant to the Pretrial Order of November 22, 1983, concerning the dispute between Rosewood Gardens Health Related Facility and New York State, the jurisdiction of this Court over the debtors, their successors under confirmed plans, and their assets is hereby terminated and these cases are CLOSED.

It is so Ordered.

EXHIBIT A

RESULTS

| CASE NUMBER | NAME OF DEBTOR | CONCLUSION | EFFECTIVE DATE |
|---|---|---|---|
| 76–1395–L | Bolton Hall Nursing Home | Dismissal | 11/ /83 |
| 76–1396–L | Christian Hill Nursing Home | Confirmed Plan of Arrangement | 08/01/78 |
| 76–1397–L | Stevens Hall Long-Term Care Facility. | Confirmed Plan of Arrangement | 05/26/78 |
| 76–1398–L | Lenox Hill Trust | Confirmed Plan of Arrangement | 08/29/79 |
| 76–1398–L | New Lenox Hill Limited Partnership. | Confirmed Plan of Arrangement | 08/29/79 |
| 76–1399–L | John Brennick | Confirmed Plan of Arrangement | 01/01/78 |
| 76–1400–L | Brook Wood Court Nursing Home. | Confirmed Plan of Arrangement | 11/13/78 |
| 76–1401–L | Forest Manor Long-Term Care Facility. | Confirmed Plan of Arrangement | 08/01/78 |
| 78–1402–L | Lewis Bay Convalescent Home. | Confirmed Plan of Arrangement | 08/01/78 |
| 76–1403 | Pioneer Valley Nursing Home Limited Partnership | Confirmed Plan of Arrangement | 05/10/78 |
| 76–1404–L | Charles Brennick | Confirmed Plan of Arrangement | 01/01/78 |
| 76–1405–L | MediCo Realty Trust | Dismissal | 12/13/78 |
| 76–1406–L | Daniel A. Donovan | Confirmed Plan of Arrangement | 01/01/78 |
| 76–1407–L | Walter A. Margerison | Confirmed Plan of Arrangement | 01/01/78 |
| 76–1408–L | Brookside Manor | Confirmed Plan of Arrangement | 11/17/78 |
| 76–1409–L | Cedar Lane Nursing Home | Confirmed Plan of Arrangement | 09/15/78 |
| 76–1410–L | Forestville Nursing Home | Confirmed Plan of Arrangement | 09/15/78 |
| 76–1411–L | Golden Hill Realty Co. | Confirmed Plan of Arrangement | 07/19/78 |
| 76–1412–L | Fairview Realty Co. | Confirmed Plan of Arrangement | 05/12/78 |
| 76–1413–L | Whitewood Manor Nursing Home. | Confirmed Plan of Arrangement | 09/11/78 |
| 76–1414–L | MediCo Associates, Inc. | Confirmed Plan of Arrangement | 05/01/78 |
| 76–1415–L | Bayhaven Nursing Home, Inc. | Confirmed Plan of Arrangement | 04/29/83 |
| 76–1416–L | B & L Management Corporation | Confirmed Plan of Arrangement | 05/31/78 |

| CASE NUMBER | NAME OF DEBTOR | CONCLUSION | EFFECTIVE DATE |
|---|---|---|---|
| 76–1417–L | Woodhaven Nursing Home | Confirmed Plan of Arrangement | 04/29/83 |
| 76–1418–L | Data Comp, Inc. | Dismissal | 12/01/78 |
| 76–1419–L | Golden Hill Realty Corporation | Confirmed Plan of Arrangement | 07/19/78 |
| 76–1420–L | Golden Hill Nursing Home | Confirmed Plan of Arrangement | 07/19/78 |
| 76–1421–L | Fairview Realty Corporation | Confirmed Plan of Arrangement | 05/12/78 |
| 76–1422–L | New Fairview Hall Convalescent Home | Confirmed Plan of Arrangement | 05/12/78 |
| 76–1423–L | Highgate Hall of Orange County, Inc. | Dismissal | 10/28/77 |
| 76–1507–L | Alpine Manor Nursing Home | Confirmed Plan of Arrangement | 08/12/77 |
| 76–1508–L | Heathwood Manor | Confirmed Plan of Arrangement | 10/02/79 |
| 76–1509–L | Hilltop Manor | Dismissal | 10/28/77 |
| 76–1576–L | 165 South Union Road Construction, Inc. | Confirmed Plan of Arrangement | 03/01/79 |
| 76–1613–L | Highgate Hall of Erie County, Inc. | Confirmed Plan of Arrangement | 10/02/79 |
| 76–1614–L | Highgate Hall of Schenectady County, Inc. | Dismissal | 10/28/77 |
| 76–1615–L | Highgate Hall of Rensselaer County, Inc. | Confirmed Plan of Arrangement | 12/01/78 |
| 76–1616–L | Highgate Hall of Cortland County, Inc. | Confirmed Plan of Arrangement | 08/15/83 |
| 76–1617–L | Highgate Hall of Saratoga County, Inc. | Dismissal | 08/27/82 |
| 76–1635–L | Rosewood Gardens Health Related Facility, Inc. | Confirmed Plan of Arrangement | 10/01/82 |
| 76–1671–L | Sylvia Brennick | Adjudicated Bankruptcy and Discharged. | 02/12/79 |
| 76–1840–L | Highgate Manor of Rensselaer | Confirmed Plan of Arrangement | 12/01/81 |
| 76–1848–L | Rosewood Gardens Health Related Facility. | Confirmed Plan of Arrangement | 10/01/82 |
| 76–1849–L | Highgate Manor of Cortland | Confirmed Plan of Arrangement | 08/15/83 |
| 76–1933–L | Brookhollow Associates | Confirmed Plan of Arrangement | 01/26/79 |
| 76–1934–L | Glen Associates | Confirmed Plan of Arrangement | 12/04/78 |
| 76–1935–L | Summit Associates | Confirmed Plan of Arrangement | 12/04/78 |
| 76–1936–L | Tri/Vest Associates | Confirmed Plan of Arrangement | 04/17/79 |

## EXHIBIT B
### Prior Interim Awards by Applicants
### Not Seeking Additional Allowances

| APPLICANT | INTERIM FEE AWARDS | INTERIM REIMBURSEMENT |
|---|---|---|
| Herbert C. Kahn, Trustee | $ 665.90 | $ 0 |
| Maloney, Gallagher & Desmond Counsel to Trustee, Joseph W. Bartlett. | 59,911.25 | 815.64 |
| Lyne, Woodward & Evarts Counsel to Senior Mortgagees Committee. | 6,302.00 | 0 |
| Richmond, Rosen & Crosson Counsel to Junior Mortgagees Committee | 15,000.00 | 0 |
| Cherwin & Glazier Counsel to Junior Mortgagees Committee | 15,000.00 | 0 |
| Joel I. Cherwin, Counsel to Arthur Lang. | 17,000.00 | 500.00 |
| Kaye, Fialkow, Richmond & Rothstein, Counsel to various Secured Creditors. | 12,750.00 | 0 |
| Rich, May, Bilodeau & Flaherty Counsel to a Secured Creditor. | 19,000.00 | 2,693.71 |
| Nixon, Hargraves, Devans & Doyle, Counsel to various Secured Creditors. | 15,000.00 | 0 |
| Ropes & Gray, Counsel to a Secured Creditor. | 6,000.00 | 0 |
| Martin, Noonan, Hislop, True & Shudt, Counsel to a Secured Creditor | 0 | 0 |
| Henry Friedman, Secretary to Junior Mortgagee Committee | 300.00 | 0 |
| Arnold Alexander and Frank H. Shapiro, Secretaries to Unsecured Creditors Committee. | 11,656.22 | 1,123.89 |
| Hilbrecht, Jones, Scheck & Bybee, Special Counsel to Trustee Joseph W. Bartlett. | 2,888.00 | 0 |
| Kaitz, Glickman & Kaitz Special Counsel to the Debtors. | 47,223.00 | 0 |
| Charles A. Stillman, Special Counsel to Debtors. | 46,300.00 | 2,673.68 |
| Wiggin & Dana, Special Counsel to Messrs. Fisher, Langan, Maguire, Bartlett and Maloney. | 11,728.24 | 258.93 |

Prior Interim Awards by Applicants
Not Seeking Additional Allowances

| APPLICANT | INTERIM FEE AWARDS | INTERIM REIMBURSEMENT |
|---|---|---|
| Harvey & Harvey, Special Counsel to Debtors. | $17,000.00 | $556.40 |
| O'Brien, Fitzgerald, Taylor & Keaveney, Accountants to Messrs. Fisher, Langan and Maguire. | 138,083.86 | 0 |
| Urbach, Kahn & Werlin, Special Accountants to Messrs. Fisher, Langan and Maguire. | 33,263.87 | 0 |
| Gladstone & Chain, Accountants to Unsecured Creditors Committee | 8,713.00 | 0 |
| Zoll, Hyman & Co., Accountants to Debtors. | 113,985.00 | 0 |
| Max Zuckerman, Special Accountant to Debtors. | 17,031.00 | 0 |
| John Quincy, Appraiser | 14,010.00 | 0 |
| John Quincy and William F. Morrissey, Appraisers. | 22,500.00 | 0 |
| John Quincy, Jr., Appraiser. | 250.00 | 0 |
| Robert J. O'Hayre, Appraiser. | 1,905.00 | 0 |
| Edmund S. Balboni, Appraiser. | 5,300.00 | 0 |
| Archie J. Horne, Appraiser. | 5,000.00 | 0 |
| John S. Cullen, Appraiser. | 5,000.00 | 0 |
| John D. Moore, Appraiser. | 1,100.00 | 0 |
| Robert I. Foster | 2,500.00 | 0 |
| Francis A. McGregor, Appraiser. | 16,125.87 | 0 |
| Richard W. Partridge, Jr., Appraiser. | 10,000.00 | 0 |
| Thomas J. Joyce, Appraiser. | 1,300.00 | 0 |
| Francis Caulfield, Appraiser. | 2,500.00 | 0 |
| David L. Cary, Appraiser. | 12,500.00 | 0 |
| Daniel L. Landry, Appraiser. | 2,500.00 | 0 |
| Edward E. Rasnick, Appraiser. | 5,000.00 | 0 |
| William J. O'Connor, Appraiser. | 3,238.28 | 0 |
| Reginald H. Gallagher | 2,500.00 | 0 |